REDACTED VERSION OF DOCUMENT FILED UNDER SEAL

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>M&G USA CORPORATION, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 17-12307 (BLS)<br><br>(Jointly Administered) |
| BANCO NACIONAL DE COMERCIO EXTERIOR, S.N.C., INSTITUCIÓN DE BANCA DE DESARROLLO,<br><br>Plaintiff,<br><br>v.<br><br>MOSSI & GHISOLFI INTERNATIONAL, S.À R.L.; M & G USA CORPORATION; M&G WATERS USA, LLC; M&G POLYMERS USA, LLC; M&G FINANCE CORPORATION; CHEMTEX INTERNATIONAL, INC.; M&G USA HOLDING, LLC; and M&G RESINS USA, LLC,<br><br>Defendants. | Adv. Proc. No. 18-50302 (BLS)<br><br>**Re: Docket Nos. 7, 8, 9, 10 & 11**<br><br>**Filed Under Seal Pursuant to Bankr. D.I. 350 and 350-1, ¶ 11; and Del. Bankr. L.R. 9018-1(e)** |

## BANCOMEXT'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND THE JOINDER OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF M&G USA CORP. *ET AL.*

---

[1] The Debtors are the following twelve entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): M & G USA Corporation (3449), M & G Resins USA, LLC (3236), M&G Polymers USA, LLC (7593), M & G Finance Corporation (4230), M&G Waters USA, LLC (2195), Mossi & Ghisolfi International S.a r.l. (1270), M&G Chemicals S.A. (N/A), M&G Capital S.a r.l. (7812), M&G USA Holding, LLC (3451), Chemtex International Inc. (7695), Chemtex Far East, Ltd. (2062) and Indo American Investments, Inc. (9208). The Debtors' noticing address in these chapter 11 cases is 450 Gears Road, Suite 240, Houston, Texas 77067.

# TABLE OF CONTENTS

GENERAL BACKGROUND.................................................................................................. 1

MOTION TO DISMISS STANDARD................................................................................. 4

ARGUMENT ...................................................................................................................... 5

A.    Bancomext Has Pleaded Claims for Fraud and Fraudulent Misrepresentation ................. 5

    i.    Bancomext Alleges the M&G Holding Credit Facility Was Obtained Through Fraudulent Misrepresentations ................................................................................6

    ii.    Bancomext Alleges the M&G Polimeros Credit Facility Was Obtained by Fraud.........9

    iii.    Defendants' Arguments that Bancomext Fails to State Claims for Fraud and Fraudulent Misrepresentation Are Unavailing ..............................................................12

B.    Bancomext Has Adequately Pleaded a Claim for Aiding and Abetting Fraud................ 19

C.    Bancomext Has Adequately Pleaded a Claim for Civil Conspiracy................................ 23

D.    Bancomext Has Adequately Pleaded a Claim for Actual Fraudulent Transfer ............... 25

E.    Bancomext Has Adequately Pleaded a Claim for Constructive Fraudulent Transfer ...... 28

F.    Bancomext Has Adequately Pleaded a Claim for Conversion ........................................ 29

    i.    Bancomext's Conversion Claim Is Not a Claim for Breach of Contract ....................30

    ii.    Bancomext Has Pleaded a Specific Interest in Property that Is the Proper Subject of a Claim for Conversion ................................................................................30

    iii.    Defendants Refused Bancomext's Demands to Turn Over Its Collateral....................32

G.    To the Extent the Court Has Jurisdiction to Consider the MTD as to the Constructive Trust Claim, It Must Be Denied ................................................................ 32

    i.    The Court Lacks Jurisdiction to Determine Bancomext's Constructive Trust Claim During the Pendency of Bancomext's Appeal of the Sale Order .....................32

    ii.    Bancomext Has Adequately Pleaded a Constructive Trust over the Corpus Christi Assets to the Extent of Its Fraudulently Obtained Loan Proceeds Used for Their Acquisition or Improvement ...............................................................36

        1.    Bancomext's Constructive Trust Claims Are Not Time Barred ........................36

            A.    The Final DIP Order Does Not Bar Bancomext from Pursuing Its Constructive Trust Claim Against the GUC Pool.........................................36

            B.    Bancomext Is Not Guilty of Laches.......................................................37

        2.    A Constructive Trust Can Be Imposed Postpetition ...........................................41

        3.    Bancomext Adequately Pleads a Claim for Constructive Trust...........................47

            A.    Bancomext Sufficiently Alleges the Actual or Constructive Fraud Element ....................................................................................47

            B.    Bancomext Sufficiently Alleges the Unjust Enrichment Element...............48

            C.    Bancomext Satisfies Its Tracing Obligation at the Pleading Stage by Identifying the Corpus Christi Assets as a Res...........................................50

CONCLUSION................................................................................................................. 54

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Advanced Thermal Sciences Corp. v. Applied Mats. Inc.*,
2009 U.S. Dist. LEXIS 139444 (C.D. Cal. Oct. 2, 2009) ...................................................48

*ASARCO LLC v. Ams. Mining Corp.*,
396 B.R. 278 (S.D. Tex 2008) ...........................................................................................19

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..............................................................................................................5

*Barkley v. W. (In re W.)*,
474 B.R. 191 (Bankr. N.D. Miss. 2012) ...........................................................................43

*Barrett v. Tallon*,
30 F.3d 1296 (10th Cir. 1994) ...........................................................................................29

*Baxter v. PNC Bank N.A.*,
541 F. App'x 395 (5th Cir. 2013) ......................................................................................47

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...........................................................................................................52

*Big Apple BMW, Inc. v. BMW of N. Am., Inc.*,
974 F.2d 1358 (3d Cir. 1992) ............................................................................................16

*Brinkmeier v. BIC Corp.*,
733 F. Supp. 2d 552 (D. Del. 2010) ..................................................................................13

*Canney v. Merchants Bank (In re Frazer)*,
284 F.3d 362 (2d Cir. 2002) ..............................................................................................43

*Chesapeake Tr. v. Chesapeake Bay Enter., Inc. (In re Potomac Supply Corp.)*,
2016 Bankr. LEXIS 509 (Bankr. E.D. Va. Feb. 18, 2016) ...............................................32

*China Res. Prods. (U.S.A.) Ltd. v. Fayda Int'l.*,
788 F. Supp. 815 (D. Del. 1992) .......................................................................................26

*City of Farrell v. Sharon Steel Corp.*,
41 F.3d 92 (3d Cir. 1994) .............................................................................................45, 51

*Claybrook v. Consolidated Foods, Inc. (In re Bake-Line Group, LLC)*,
359 B.R. 566 (Bankr. D. Del. 2007) ............................................................................41, 42

*Clemmons v. NVT Techs., Inc.*,
2015 U.S. Dist. LEXIS 86983 (M.D.N.C. July 6, 2015) ...................................................50

*Cohen v. Koenig*,
25 F.3d 1168 (2d Cir. 1994) ....................................................................................7, 11, 19

*Craftmatic Secs. Litig. v. Kraftsow*,
890 F.2d 628 (3d Cir. 1989) ..............................................................................................13

*Crawford v. Zambrano (In re Zambrano Corp.)*,
478 B.R. 670 (Bankr. W.D. Pa. 2012) ..........................................................................12, 24

ii

*DB Structured Prods. v. Am. Home Mortg. Holdings* (*In re Am. Home Mortg. Holdings*),
    402 B.R. 87 (Bankr. D. Del. 2009) ........................................................................................38

*EBS Pension L.L.C. v. Edison Bros. Stores, Inc.* (*In re Edison Bros., Inc.*),
    243 B.R. 231 (Bankr. D. Del. 2000) ......................................................................................50

*El Camino Res., Ltd. v. Huntington Nat'l Bank*,
    712 F.3d 917 (6th Cir. 2013) .................................................................................................18

*Fabry's S.r.L. v. IFT Int'l, Inc.*,
    2003 U.S. Dist. LEXIS 8597 (S.D.N.Y. May 21, 2003) .......................................................28

*Fax Telecommunicaciones Inc. v. AT&T*,
    138 F.3d 479 (2d Cir. 1998) ....................................................................................................5

*Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A.*,
    2002 U.S. Dist. LEXIS 18115 (S.D.N.Y. Sept. 25, 2002).....................................................27

*Flentye v. Kathrein*,
    485 F. Supp. 2d 903 (N.D. Ill. 2007) .....................................................................................39

*Fowler v. UPMC Shadyside*,
    578 F.3d 203 (3d Cir. 2009).....................................................................................................4

*Goldberg v. N.J. Lawyers' Fund for Client Prot.*,
    932 F.2d 273 (3d Cir. 1991).....................................................................................................46

*HBE Leasing Corp. v. Frank*,
    48 F.3d 623 (2d Cir. 1995).......................................................................................................23

*In re Abbotts Dairies*,
    788 F.2d 143 (3d Cir. 1986).....................................................................................................32

*In re Allustiarte*,
    1990 U.S. App. LEXIS 21058 (9th Cir. Dec. 4, 1990)...........................................................32

*In re Avandia Litig.*,
    804 F.3d 633 (3d Cir. 2015)......................................................................................................4

*In re Casbeer*,
    793 F.2d 1436 (5th Cir. 1986) (Texas follows first-in-time priority rule subject
    to relation back exceptions) ...................................................................................................45

*In re DVI, Inc.*,
    306 B.R. 496 (Bankr. D. Del. 2004) .........................................................................38, 41, 45

*In re G-I Holdings, Inc.*,
    568 B.R. 731 (Bankr. D.N.J. 2017) ...................................................................................31, 32

*In re Hydro-Action, Inc.*,
    No. 01-10209, 2004 Bankr. LEXIS 262 (Bankr. E.D. Tex. Jan. 22, 2004)............................44

*In re Kaiser*,
    722 F.2d 1574 (2d Cir. 1983)...........................................................................................12, 24

*In re Lodek*,
    61 B.R. 66 (Bankr. W.D. Tex. 1986) .......................................................................................42

*In re Madison's Partner Grp., Inc.*,
    67 B.R. 629 (Bankr. D. Minn. 1986) ...................................................................44

*In re NJ Affordable Homes Corp.*,
    2006 Bankr. LEXIS 4498 (Bankr. D.N.J. June 29, 2006) ....................................38

*In re Norris Grain Co.*,
    167 B.R. 258 (Bankr. M.D. Fla. 1994) ................................................................32

*In re Prudential Lines, Inc.*,
    170 B.R. 222 (S.D.N.Y. 1994)...............................................................................32

*In re Sovereign Estates, Ltd.*,
    104 B.R. 702 (Bankr. E.D. Pa. 1989) ..................................................................38

*In re Suniva, Inc.*,
    No. 17-10837 (KG), 2018 Bankr. LEXIS 761 (Bankr. D. Del. Mar. 16, 2018) ....50

*In re U.S.N. Co.*,
    32 B.R. 675 (Bankr. S.D.N.Y. 1983) ....................................................................51

*Kemp v. Eiland*,
    139 F. Supp. 3d 329, 349-50 (D.D.C. 2015)........................................................39

*Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*,
    331 F.3d 406 (3d Cir. 2003).................................................................................12

*Moses v. Martin*,
    360 F. Supp. 2d 533 (S.D.N.Y. 2004)..................................................................29

*Noland v. HSBC Auto Fin., Inc. (In re Baine)*,
    393 B.R. 561 (Bankr. S.D. Ohio 2008).................................................................43

*Ogle v. Comcast Corp. (In re Houston Reg'l Sports Network, L.P.)*,
    547 B.R. 717 (Bankr. S.D. Tex. 2016) .................................................................18

*Over & Out, Inc. v. Eclipse Aviation Corp. (In re AE Liquidation, Inc.)*,
    426 B.R. 511 (Bankr. D. Del. 2010) .....................................................................51

*Page v. Crown Ranch Dev. Ltd. (In re Crown Ranch Dev. Ltd.)*,
    2012 Bankr. LEXIS 1314 (Bankr. E.D. Tex. Mar. 29, 2012)..................................5

*Pioneer Commercial Funding Corp. v. United Airlines, Inc.*,
    122 B.R. 871 (S.D.N.Y. 1991)..............................................................................29

*Redrock Admin. Servs. LLC v. Magna Entm't Corp. (In re Magna Entm't Corp.)*,
    438 B.R. 380 (Bankr. D. Del. 2010) .....................................................................49

*Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*,
    401 F.3d 123 (3d Cir. 2005).................................................................................39

*Shapiro v. UJB Fin. Corp.*,
    964 F.2d 272 (3d Cir. 1992).................................................................................12

*Singh v. AG of the United States*,
    677 F.3d 503 (3d Cir. 2012).............................................................................40, 41

*SLW Capital, LLC v. Mansaray-Ruffin (In re Mansaray-Ruffin)*,
530 F.3d 230 (3d Cir. 2008)..................................................................34

*Sonneberg v. United States*,
2003 U.S. App. LEXIS 6503 (3d Cir. Apr. 4, 2003) ...........................15

*Stanton v. Couturier*,
2007 U.S. Dist. LEXIS 95515 (E.D. Cal. Dec. 21, 2007) ...............49, 50

*Stewart v. Jackson & Nash*,
976 F.2d 86 (2d Cir. 1992)..........................................................7, 10, 11

*Tara Woods Ltd. P'ship v. Fannie Mae*,
731 F. Supp. 2d 1103 (D. Colo. 2010)...................................................4

*Thomas v. City of Phila. (In re Thomas)*,
497 B.R. 188 (Bankr. E.D. Pa. 2013) ...................................................34

*U.S. Bank N.A. v. Verizon Commc'ns, Inc.*,
817 F. Supp. 2d 934 (N.D. Tex. 2011) .................................................20

*Underhill Inv. Corp. v. Fixed Income Disc. Advisory Co.*,
319 F. App'x 137 (3d. Cir. 2009) ...........................................................5

*Unicredito Italiano v. JPMorgan Chase Bank*,
288 F. Supp. 2d 485 (S.D.N.Y. 2003)......................................17, 19, 20

*United States v. Colton*,
231 F.3d 890 (4th Cir. 2000) ................................................................15

*Venen v. Sweet*,
758 F.2d 117 (3d Cir. 1985)............................................................31, 33

*Vexol S.A. de C.V. v. Berry Plastics Corp*,
2017 WL 4583515 (S.D. Ind. May 17, 2017).......................................17

*VFB LLC v. Campbell Soup Co.*,
2005 U.S. Dist. LEXIS 19999 (D. Del. Sept. 13, 2005).................24, 25

*Victaulic Co. v. Tieman*,
499 F.3d 227 (3d Cir. 2007).....................................................................4

*Vox Amplification Ltd v. Meussdorffer*,
50 F. Supp. 3d 355, 364 (E.D.N.Y. 2014) ............................................39

*Wachovia Bank v. Metro Automation*,
2009 U.S. Dist. LEXIS 40415 (Bankr. N.D. Tex. May 13, 2009).........29

*Wilkerson v. New Media Tech. Charter Sch. Inc.*,
522 F.3d 315 (3d Cir. 2008)....................................................................5

**STATE CASES**

*Abacus Fed. Sav. Bank v. Lim*,
75 A.D.3d 472 (N.Y. App. 2010) ..........................................................21

*Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*,
257 Mich. App. 365 (Mich. App. 2003) ................................................21

*Anderton v. Cawley*,
    378 S.W.3d 38 (Tex. App. 2012).........................................................................21

*Bentley v. Caille*,
    289 Mich. 74 (1939) ........................................................................................24

*Blankenship v. Citizens Nat'l Bank*,
    449 S.W.2d 77 (Tex. Ct. App. 1969) ...............................................................42

*Carr v. Weiss*,
    984 S.W.2d 753 (Tex. App. 1999).....................................................................43

*City of Corpus v. S.S. Smith & Sons Masonry, Inc.*,
    736 S.W.2d 247 (Tex. App. 1987).....................................................................47

*Crisp v. Sw. Bancshares Leasing Co.*,
    586 S.W.2d 610 (Tex. App. 1979).....................................................................18

*Dep't of Agric. v. Appletree Mktg., L.L.C.*,
    485 Mich. 1 (2010) ..........................................................................................27

*Dryden v. Estate of Gallucio*,
    2007 Del. Ch. LEXIS 9 (Del. Ch. Jan. 11, 2007) ............................................24

*Flournoy v. Wilz*,
    201 S.W.3d 833 (Tex. Ct. App. 2006) ..............................................................52

*Foreman v. Foreman*,
    266 Mich. App. 132 (2005) .................................................................................8

*Formosa Plastics Corp. U.S. v. Presidio Eng'rs & Contractors*,
    960 S.W.2d 41 (Tex. 1998).................................................................................8

*Freeman v. Harleton Oil & Gas, Inc.*,
    528 S.W.3d 708 (Tex. App. 2017).....................................................................46

*Ginther v. Taub*,
    675 S.W.2d 724 (Tex. 1984)..............................................................................46

*Greenfield v. Tele-Commc'ns, Inc.*,
    1989 Del. Ch. LEXIS 49 (Del. Ch. 1989)..........................................................22

*Heldenfels Bros., Inc. v. Corpus Christi*,
    832 S.W.2d 39 (Tex. 1992)................................................................................48

*Hi-Way Motor Co. v. Int'l. Harvester Co.*,
    398 Mich. 330 (Mich. 1976) ...............................................................................5

*In re Bracket Holding Corp. Litig.*,
    2017 Del. Super LEXIS 377 (Del. Super. July 31, 2017).................................22

*In re Lyle*,
    2013 Del. LEXIS 429 (Del. Aug. 23, 2013) ................................................5, 6, 7

*Isr. Disc. Bank of N.Y. v. First State Depository Co.*,
    2013 Del. Ch. LEXIS 136 (Del. Ch. May 29, 2013) .........................................27

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*,
    341 S.W.3d 323 (Tex. 2011)...........................................................5

*KCM Fin. LLC v. Bradshaw*,
    457 S.W.3d 70 (Tex. 2015)...........................................................46

*LVI Grp. Invs., LLC v. NCM Grp. Holdings, LLC*,
    2018 Del. Ch. LEXIS 101 (Del. Ch. Mar. 28, 2018).................22, 48

*Marathon Mach. Tools, Inc. v. Davis-Lynch, Inc.*,
    400 S.W.3d 133 (Tex. App. 2013).........................................42, 44, 45

*MBank Waco, N.A. v. L.&J., Inc.*,
    754 S.W.2d 245 (Tex. App. 1988)...............................................44

*McAfee, Inc. v. Agilysys, Inc.*,
    316 S.W.3d 820 (Tex. App. 2010)...............................................48

*McGowan v. Ferro*,
    859 A.2d 1012 (Del. Ch. 2004)....................................................27

*Md. Cas. Co. v. Schroeder*,
    446 S.W.2d 117 (Tex. Civ. App. 1969).......................................52

*Meadows v. Bierschwale*,
    516 S.W.2d 125 (Tex. 1974)...............................................42, 45, 48, 49

*NACCO Indus. v. Applica Inc.*,
    997 A.2d 1 (Del. Ch. 2009)...........................................................8

*Nwokedi v. Unlimited Restoration Specialists, Inc.*,
    428 S.W.3d 191 (Tex. App. 2014)...............................................46

*PR Acquisitions v. Midland Funding*,
    2018 Del. Ch. LEXIS 137 (Del. Ch. April 30, 2018) ...................17

*Ross v. Louise Wise Servs., Inc.*,
    8 N.Y.3d 478 (N.Y. App. 2007) ....................................................5

*Spolijaric v. Percival Tours, Inc.*,
    708 S.W.2d 432 (Tex. 1986).........................................................12

*Szczerba v. Am. Cigarette Outlet, Inc.*,
    2016 Del. LEXIS 278 (Del. Super. April 1, 2016) .......................21, 22

*Teachers' Ret. Sys. v. Aidinoff*,
    900 A.2d 654 (Del. Ch. 2006).......................................................50

*Waisath v. Lack's Stores, Inc.*,
    474 S.W.2d 444 (Tex. 1971).........................................................27

*York v. Boatman*,
    487 S.W.3d 635 (Tex. App. 2016)...............................................41, 43

## FEDERAL STATUTES

11 U.S.C. § 363(e) ...........................................................................38

11 U.S.C. § 363(f) ................................................................................................38

11 U.S.C. § 541(d) ...........................................................................................34, 40

11 U.S.C. § 544(a) .....................................................................................40, 43, 44

## FEDERAL RULES

Fed. R. Bankr. P. 7001(2) ................................................................................33, 34

Fed. R. Bankr. P. 7012 ..........................................................................................4

Fed. R. Civ. P. 9(b) ...........................................................................12, 13, 18, 22

Fed. R. Civ. P. 8(a) .............................................................................................29

Fed. R. Civ. P. 12(b)(6).................................................................................4, 50

Local Rule 7007-2...............................................................................................1

Local Rule 7007-2(a)(iv) ....................................................................................1

## MISCELLANEOUS

Restatement of Restitution...................................................................................42

Restatement (Second) of Torts............................................................................18

S. Rep. No. 989, 95th Cong., 2d Sess. 56 (1978) .............................................38

## STATE STATUTES

6 Del. C. § 1301(7)(d)........................................................................................25

6 Del. C. § 1304 .................................................................................................23

6 Del. C. § 1304(b) ............................................................................................24

6 Del. C. § 1305 .................................................................................................26

MCL 566.34(1)(a)...............................................................................................23

MCL 566.34(2) ...................................................................................................24

MCL § 566.34 .....................................................................................................26

Tex. Bus. & Com. Code Ann. § 24.005(a)(1).....................................................23

Tex. Bus. & Com. Code Ann. § 24.005(b) .........................................................24

Tex. Bus. & Com. Code § 24.005.......................................................................26

Banco Nacional de Comercio Exterior, S.N.C., Institución de Banca de Desarrollo

("**Bancomext**" or "**Plaintiff**"), hereby files its opposition and response to (i) *Defendants' Motion to Dismiss Amended Complaint* [Adv. D.I. 7] (the "**MTD**") and brief filed in support thereof [Adv. D.I. 8, 9] (the "**Defendants' Brief**"), each filed by the above-captioned defendants (collectively, the "**Defendants**"); and (ii) *Official Committee of Unsecured Creditors' Joinder and Supplemental Memorandum of Law in Support of the Motion to Dismiss* [Adv. D.I. 11] (the "**Committee Joinder**"), filed by the official committee of unsecured creditors appointed in the above-captioned chapter 11 cases (the "**Committee**").[1] Each capitalized term used but not otherwise defined herein shall have the meaning ascribed to such term in the *First Amended Complaint* [Adv. D.I. 5] (the "**FAC**").

## GENERAL BACKGROUND

Bancomext filed its FAC to right a series of wrongs committed by Defendants. Defendants' wrongful conduct is alleged in detail in the FAC and is sufficient to state a claim for each count set forth therein. Defendants' wrongs resulted in losses to Bancomext of $190 million and fall into four major categories.

*First*, Defendants caused their affiliated Mexican Entity, M&G Holding, to obtain a revolving line of credit from Bancomext for the stated purpose of financing exports. In soliciting the line of credit, representatives of both M&G Holding and Defendants promised Bancomext that M&G Holding would use the line only for its stated purpose and employ a specific transaction structure that, if followed, would have made diversion of the loan proceeds for non-permitted purposes impossible. Under this structure, each draw would be matched immediately

---

[1] Since this brief constitutes a response to both the Defendants' Brief and the Committee Joinder, Plaintiff submits the page limitations prescribed under Local Rule 7007-2(a)(iv) should be considered accordingly. To that end, Plaintiff files herewith a motion to exceed the page limitations set forth in Local Rule 7007-2.

by a corresponding receivable that would be used to repay Bancomext. Based upon Defendants' and M&G Holding's representations, Bancomext concluded the risk level was acceptable and granted the loan to M&G Holding.

Defendants' representations concerning the transaction structure were either false when made or were made recklessly without regard for the truth. Among other things, M&G Holding and Defendant M&G International *never* followed the promised structure. Instead, they treated the loan proceeds as general corporate funds available for use by both M&G Holding and the Defendants, with the result being that M&G Holding now owes $120 million to Bancomext with no corresponding receivable to satisfy this amount. Defendants caused M&G Holding to make draw after draw under its Bancomext facility, knowing each time that it was failing to comply with the terms of the credit. In a dramatic final fraudulent act, in September of 2017, while it was shuttering its manufacturing plant, M&G Holding drew everything it could under the line of credit and transferred it to M&G International in exchange for a worthless note.

***Second***, Defendants caused M&G Polimeros to obtain a revolving line of credit from Bancomext in 2015 on the false premise that it would be used by M&G Polimeros and not diverted to Defendants. At the time, Defendants needed money to cover cost overruns in the construction of a new plant in Corpus Christi, Texas, and to operate their money losing U.S. businesses. M&G Polimeros was Defendants' only profitable subsidiary and had positive EBITDA and cash flow. Defendants determined to exploit M&G Polimeros' cash and creditworthiness to finance their own operations while concealing their intentions to Bancomext. Defendants caused M&G Polimeros to request credit from Bancomext on the false premise that the proceeds would be used solely to fund M&G Polimeros' working capital needs. Defendants knew that they had to make these statements in order to obtain credit because Bancomext, as Mexico's state-owned import/export bank, would never fund Defendants' U.S. operations. As

soon M&G Polimeros signed its credit agreement, Defendants caused it to fully draw the line and immediately send all of the loan proceeds to Defendant M&G Polymers USA. As repayments allowed for new availability under the line, the vast majority of subsequent draws were sent to M&G Polymers USA, M&G International, and other Defendants, including M&G Resins—the owner of the Corpus Christi plant. In short, Defendants directed and participated in a scheme to fraudulently induce Bancomext to lend money to M&G Polimeros and diverted the proceeds for their own use, leaving M&G Polimeros unable to repay Bancomext.

*Third*, Defendants did not just misappropriate the proceeds of Bancomext's loans; they also systematically looted the Mexican Entities in what can only be described as a series of textbook fraudulent transfers. The Debtors have admitted, under penalty of perjury, that they received approximately $550 million of cash from the Mexican Entities starting in 2016 in the form of "intercompany loans." They also admit that the PET plant owned by M&G Polimeros was shut down on September 5, 2017, because it could not pay its vendors and had other financial difficulties. There is no doubt that the massive transfers of cash from the Mexican Entities to Defendants ruined the Mexican Entities and directly led to Bancomext's losses. As a creditor of the Mexican Entities, Bancomext is entitled to recovery of the fraudulent transfers made by Mexican Entities to Defendants.

*Fourth*, in 2017, Defendants converted Bancomext's collateral. The obligations under the Revolving Credit Facilities were secured by (i) the receivables owed by M&G Polymers USA to M&G Polimeros under a supply agreement; (ii) the receivables owed by M&G International to M&G Holding in connection with the sale of certain raw materials, supposedly financed by the Bancomext credit line to M&G Holding; and (iii) by M&G Polimeros' inventory. No proceeds of Bancomext's collateral were paid to Bancomext, even after Bancomext demanded payment. Moreover, though M&G Polimeros represented that

Bancomext's inventory collateral had substantial value immediately before it closed its plant, almost all of that inventory had been liquidated when the plant was shuttered and the proceeds were sent to Defendants.

As a result of the foregoing, Bancomext is entitled to a claim against Defendants in the amount of $190 million. In addition, it is entitled to a constructive trust to the extent that it can ultimately trace its loan proceeds. The MTD should be denied.

## MOTION TO DISMISS STANDARD

1.  In evaluating a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "**Civil Rules**"), made applicable here by Bankruptcy Rule 7012, courts must accept as true all material allegations of the complaint. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *In re Avandia Litig.*, 804 F.3d 633, 638 (3d Cir. 2015). Thus, a motion to dismiss may be granted only if, after "accepting all well pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *Id.*

2.  All that is required to survive a motion to dismiss is that a plaintiff "allege facts that 'raise a right to relief above the speculation level on the assumption that the allegations in the complaint are true (even if doubtful in fact).'" *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "The [*Twombly*] Court makes clear that the 'plausibility' requirement is not an invitation to the Court to speculate as to whether well-pleaded facts alleged by the pleader are likely to prove true or not." *Tara Woods Ltd. P'ship v. Fannie Mae*, 731 F. Supp. 2d 1103, 1113 n.5 (D. Colo. 2010).

3.  A claim is facially plausible, and sufficient to survive a motion to dismiss, "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"The complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary element" of a plaintiff's claim. *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 321 (3d Cir. 2008) (internal quotations omitted).

## ARGUMENT

### A. Bancomext Has Pleaded Claims for Fraud and Fraudulent Misrepresentation

4.     Fraudulent representation and fraud have substantially the same elements.[2] These are (1) a false representation of material fact; (2) the knowledge or belief that the representation was false, or made with reckless indifference to the truth; (3) the intent to induce another party to act or refrain from acting; (4) the action or inaction taken was in justifiable reliance on the representation; and (5) damage to the other party as a result of the representation. *In re Lyle*, 2013 Del. LEXIS 429, at *21-22 (Del. Aug. 23, 2013).[3] Here, Bancomext has alleged each element of its fraud-based claims in respect of the M&G Holding Credit Facility and the M&G Polimeros Credit Facility.

---

[2]     *See, e.g.*, *Page v. Crown Ranch Dev. Ltd.* (*In re Crown Ranch Dev. Ltd.*), 2012 Bankr. LEXIS 1314, at *17 (Bankr. E.D. Tex. Mar. 29, 2012) ("Although Plaintiffs separately asserted causes of action for fraudulent misrepresentation, fraud by nondisclosure, and common law fraud in their complaint, Texas courts treat those grounds of liability as one and the same."); *Fax Telecomunicaciones Inc. v. AT&T*, 138 F.3d 479, 490 (2d Cir. 1998) (New York law requires same elements for fraudulent misrepresentation and fraudulent inducement).

[3]     The elements are the same under Michigan, New York, and Texas law. *See Hi-Way Motor Co. v. Int'l. Harvester Co.*, 398 Mich. 330, 336 (Mich. 1976); *Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 488 (N.Y. App. 2007); *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011). As such, choice of law questions are not relevant at this juncture. *Underhill Inv. Corp. v. Fixed Income Disc. Advisory Co.*, 319 F. App'x 137, 140 (3d. Cir. 2009) ("Where the laws of the . . . jurisdictions would produce the same result on the particular issues presented, there is a 'false conflict,' and the Court should avoid the choice-of-law question."). Throughout this Opposition, Bancomext will show that each count of the FAC is sufficient to survive the MTD under each potentially applicable state law. To the extent that a difference in state laws would be determinative, the inquiry will turn on the application of the most significant relationship test. *See Chase Manhattan Mortg. Corp.*, 2005 U.S. Dist. LEXIS 19374, at *40-41 (D. Del. Sep. 8, 2005). Bancomext reserves the right to argue for the application of the law of the legally appropriate jurisdiction once it has had the opportunity to conduct full discovery.

### i. Bancomext Alleges the M&G Holding Credit Facility Was Obtained Through Fraudulent Misrepresentations

5.       In late 2009, M&G Holding, under Defendants' control, approached Bancomext to obtain a revolving line of credit.  To induce Bancomext to extend the credit, representatives of M&G Holding and Defendants made a series of representations to Bancomext.  Most importantly, they represented that the line of credit would be used exclusively to finance exports as part of a transaction structure designed to minimize Bancomext's credit risk.  FAC ¶¶ 23-26.

6.       M&G Holding and Defendants described such structure as follows:  (a) M&G Holding would use the proceeds of the line of credit exclusively to purchase PTA—an important raw material—from DAK on a COD basis; (b) M&G Holding then would immediately resell the PTA to Defendant M&G International on 90 day terms; (c) M&G International would, in turn, immediately sell the PTA to M&G Brazil, also on 90 day terms; and, finally (d) M&G International would immediately repay Bancomext for the PTA that had been purchased with the loans as soon as M&G International received payment from M&G Brazil.  FAC ¶ 23.

7.       Importantly, the FAC details exactly when and how these representations were made.  Such representations were originally made by Rodolfo Perez Vazquez, an employee of M&G Polimeros, in an email sent in mid-October of 2009 to Bancomext in connection with the initial solicitation of the M&G Holding Credit Facility.  FAC ¶ 24.  A more specific description of the structure was provided by M&G Holding to Bancomext in a PowerPoint presentation emailed by Mr. Perez Vazquez to Bancomext on October 30, 2009.  *Id.*

8.       Shortly thereafter, Defendants orchestrated an in-person meeting to plead the case for the M&G Holding Credit Facility.  That meeting was attended by Marco Ghisolfi, an insider and representative of Defendants, Mr. Felipe Garza Medina, an officer of DAK, and several officers of Bancomext.  FAC ¶ 25.  During this meeting, Mr. Ghisolfi reiterated the request that

Bancomext extend credit to M&G Holding and stated that M&G Holding would use and repay the line as described in Mr. Perez Vazquez's PowerPoint presentation. *Id.* Mr. Ghisolfi further explained to Bancomext that the purpose of the facility was to secure a reliable source of payment for DAK in order to obtain price discounts for PTA. *Id.* Bancomext relied on these representations to approve the M&G Holding Credit Facility. FAC ¶ 26.

9. These representations, however, were either false or made with a reckless disregard for the truth. Indeed, M&G Holding ***never*** followed the agreed upon structure for repaying the loans, exposing Bancomext to a materially higher repayment risk. FAC ¶ 97. That M&G Holding ***never*** followed the promised structure is a clear indication that Mr. Ghisolfi and the representatives of M&G Holding and Defendants intended to mislead Bancomext when they requested the M&G Holding Credit Facility.

10. These allegations are more than sufficient to plead fraudulent misrepresentation. Defendants induced Bancomext to extend the M&G Holding Credit Facility by representing to Bancomext that its loan proceeds would be used exclusively to pay DAK for PTA and that M&G International would repay Bancomext as soon as it received funds from the sale of the PTA. Defendants never kept their promise to implement this procedure. *See Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994) (New York law) (allegations that defendants knowingly made false representations in order to obtain credit sufficient to support fraud claim); *see also Stewart v. Jackson & Nash*, 976 F.2d 86, 89 (2d Cir. 1992) (New York law) ("if a promise was actually made with a preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of material existing fact").[4]

---

[4] Making a promise with no present intention of fulfilling it is fraudulent in each relevant jurisdiction. *See NACCO Indus. v. Applica Inc.*, 997 A.2d 1, 27 (Del. Ch. 2009) ("Black letter law permits a misrepresentation regarding intent to form the basis for a fraud claim. 'A representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention.'") (quoting Restatement (Second) of Torts

11.     As set forth above, Defendants' misrepresentations caused Bancomext to enter into the M&G Holding Credit Facility.  But the misrepresentations did not end there.  Not only did Defendants misrepresent the structure of the transactions for which the proceeds were to be used; they also made misrepresentations to Bancomext when they drew under the M&G Holding Credit Facility with the intent to use the funds for purposes other than those provided in the M&G Holding Credit Agreement.

12.     M&G Holding made many draws under the M&G Holding Credit Facility.  At least as early as October 2015, M&G Holding was making draws and immediately transferring the proceeds into the Pooling Account.[5]  FAC ¶ 58.  The Pooling Account was controlled by Defendants, and not M&G Holding, and contained commingled funds belonging to many, if not all, Defendants.  FAC ¶ 52.  This in and of itself constituted a misuse of the M&G Holding Credit Facility, because Defendants and M&G Holding had specifically represented that the loan proceeds would be used only to pay DAK invoices and not for any other purpose.  FAC ¶ 23.  Immediately after the loan proceeds were placed in the Pooling Account, Defendants would transfer the loan proceeds to their own accounts and use them for their own purposes.  FAC ¶¶ 58-62.  Indeed, transfers of proceeds from the M&G Holding Credit Facility ███████████ ███████████████████████████████.  *Id.*  Exhibit F to the FAC contains a chart detailing the diversion of proceeds of the M&G Holding Credit Facility to Defendants.

---

§ 530(1)); *Foreman v. Foreman*, 266 Mich. App. 132, 143 (2005) ("[A]n unfulfilled promise to perform in the future is actionable when there is evidence that it was made with a present undisclosed intent not to perform.") (citing *Rutan v. Straehly*, 286 N.W. 639, 642 (Mich. 1939)); *Formosa Plastics Corp. U.S. v. Presidio Eng'rs & Contractors*, 960 S.W.2d 41, 48 (Tex. 1998) ("when one party enters into a contract with no intention of performing, that misrepresentation may give rise to an action in fraud").

[5]     Allegations in the FAC as to when M&G Holding's deposits into the Pooling Account began are based on information available to Bancomext.  Bancomext has not had access to all relevant records but expects that discovery will reveal Defendants diverted proceeds of the M&G Holding Credit Facility to the Pooling Account well before 2015.

13.     Moreover, each draw under the M&G Holding Credit Facility was a representation to Bancomext that its loans would be used as required by the loan documents. FAC ¶ 100. Exhibit F to the FAC, however, shows that the proceeds of many draws were improperly diverted to Defendants. At the time each draw was made, M&G Holding, under Defendants' control, knew that it was requesting loans for improper purposes and intended that Bancomext rely on the implicit representation of compliance under the facility in honoring the draws. Indeed, the loan proceeds were immediately diverted to the Pooling Account and, from there, immediately transferred to Defendants. FAC ¶¶ 100-102. The foregoing allegations are sufficient to state a claim for fraudulent misrepresentation.

### ii.     Bancomext Alleges the M&G Polimeros Credit Facility Was Obtained by Fraud

14.     Bancomext adequately pleads fraud in the FAC in connection with the M&G Polimeros Credit Facility. This fraud has its genesis in Defendants' financial crisis brought about by the Corpus Christi plant. Construction on the plant, which was intended to be Defendants' crown jewel, began in 2013. FAC ¶ 36. Though initially slated for completion by December 2015, Defendants faced massive construction delays and cost overruns and the plant has yet to be completed to this day. FAC ¶ 37. After fully exhausting their initial financing, Defendants were unable to raise additional capital through conventional means. FAC ¶ 38. As a result, they were forced to finance ongoing construction from cash flow and through non-traditional means, such as the sale of future production to DAK. *Id.* When these sources, too, proved inadequate to complete construction, Defendants set their sights on M&G Polimeros' credit and ability to qualify for loans from Bancomext. FAC ¶ 40.

15.     With M&G Polimeros' positive cash flow and significant EBITDA, Defendants believed that they could leverage its credit to secure financing for their own purposes. *Id.* They

did not, however, tell Bancomext of their plans. Instead, in mid-2015, they caused M&G Polimeros to request a revolving line of credit specifically "to provide working capital to M&G Polimeros." FAC ¶ 41. M&G Polimeros also presented financial statements to Bancomext showing that M&G Polimeros would be able to repay the Bancomext loans from cash flow without disclosing that M&G Polimeros did not have control over its cash and that all of its cash would be deposited into the Pooling Account, comingled with Defendants' cash, and be subject to Defendants' control and use. FAC ¶¶ 40, 49-51.

16.     On August 3, 2015, Bancomext and M&G Polimeros, under the control of Defendants, entered into the M&G Polimeros Credit Agreement. Such agreement expressly states that "[t]he BORROWER agrees to invest the amount of the CREDIT to finance its own revolving working capital and that of subsidiaries, as well as to finance debt"; and further provides that M&G Polimeros may not draw on the line of credit unless "[M&G Holding] is in complete compliance with its obligations" under the M&G Holding Credit Facility. *See* FAC, Ex. D. Defendants caused M&G Polimeros to agree to such terms, even though they never intended to use the proceeds of the M&G Polimeros Credit Facility to provide capital to M&G Polimeros. Instead, Defendants intended to use the proceeds of the M&G Polimeros Credit Facility for their own purposes. FAC ¶ 45. Defendants' intent to defraud Bancomext is clear from the fact that M&G Polimeros drew the full amount available under the revolving facility immediately after executing the M&G Polimeros Credit Agreement ███████████████████ ███████████████████. Indeed, on August 10, 2015, M&G Polimeros drew $20 million under the M&G Credit Facility. FAC ¶ 55. That amount was deposited by Bancomext into M&G Polimeros' checking account. ███████████████████ ██████████████████████████████████████████████ ████████████████████████████. *Id.*

17.     The following day, August 11, 2015, M&G Polimeros drew another $25 million. The funds were once again deposited into M&G Polimeros' checking account, and ███████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████. *Id.*

18.     This same pattern continued through August 2017.  As evidenced by Exhibit E to the FAC, each draw on the M&G Polimeros Credit Facility was ████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ███████████████████████. FAC ¶ 56.  As alleged in the FAC, "from day one, draws under the M&G Polimeros Credit Facility were made not to fund M&G Polimeros' working capital needs," but, instead, were wrongfully diverted to satisfy Defendants' cash needs.  FAC ¶ 57.

19.     These allegations are sufficient to state a claim for fraud.  M&G Polimeros, under the control of Defendants, requested a line of credit on the false premise that it, and not Defendants, would use the loan proceeds.  FAC ¶¶ 45, 57.  Thereafter, M&G Polimeros executed the M&G Polimeros Credit Agreement expressly providing that the proceeds would be used exclusively for M&G Polimeros' own working capital needs.  FAC ¶ 44.  Neither M&G Polimeros nor Defendants ever intended that M&G Polimeros would comply with the agreement and M&G Polimeros immediately transferred the fraudulently obtained proceeds to Defendants for their own use.  FAC ¶¶ 45, 53-57.  It is fraud to make false representations for the purpose of obtaining credit.  *Cohen*, 25 F.3d at 1172 (allegations that defendants knowingly made false representations in order to obtain credit sufficient to support fraud claim); *AE Mktg., L.L.C. v. Jenkins-Baldwin Corp.*, 2013 U.S. Dist. LEXIS 200821, at *33 (N.D. Tex. May 22, 2013) (false statements intended to induce lender to extend credit sufficient to support claim for common law

fraud); *Daly v. Braizblot* (*In re Braizblot*), 194 B.R. 14, 22 (Bankr. E.D.N.Y. 1996) (loans obtained with false promises to repay that borrowers did not intend to honor were fraudulently induced).[6] Further, obtaining funds and then immediately absconding with them is strong evidence of fraudulent intent. *See In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983); *Crawford v. Zambrano* (*In re Zambrano Corp.*), 478 B.R. 670, 691 (Bankr. W.D. Pa. 2012).

### iii. Defendants' Arguments that Bancomext Fails to State Claims for Fraud and Fraudulent Misrepresentation Are Unavailing

20.     Defendants' attack on Bancomext's fraud and fraudulent misrepresentation claims relies primarily on Civil Rule 9(b), which requires a party alleging fraud to "state with particularity the circumstances constituting fraud or mistake" but allows "intent, knowledge, and other conditions of a person's mind [to] be alleged generally." Fed. R. Civ. P. 9(b). The purpose of Civil Rule 9(b)'s heightened pleading requirement "is to provide notice, not to test the factual allegations of the claim." *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 414 n.2 (3d Cir. 2003) (citing *Gutman v. Howard Savings Bank*, 748 F. Supp. 254, 257 (D.N.J. 1990)). The Third Circuit counsels caution in applying Civil Rule 9(b), directing "courts [to] be 'sensitive' to the fact that application of the Rule prior to discovery 'may permit sophisticated defrauders to successfully conceal the details of their fraud.'" *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 284-85 (3d Cir. 1992) (citing *Christidis v. First Pa. Mtg. Tr.*, 717 F.2d 96, 99 (3d Cir. 1983)). Accordingly, the rule should be applied less rigorously where the factual information is peculiarly within the defendant's knowledge or control. *See Shapiro*, 964 F.2d at 285. This is particularly true in cases of corporate fraud as plaintiffs cannot be expected to have detailed knowledge of internal corporate affairs. *Craftmatic Secs. Litig. v. Kraftsow*, 890 F.2d

---

[6]     *See also* ¶ 10 & n.4, *infra*; *see also Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986) ("A promise to do an action in the future is actionable fraud when made with the intention, design, and purpose of deceiving, and no intention of performing the act.").

628, 645 (3d Cir. 1989). In such situations, a plaintiff may plead based on information and belief, "but only if the pleading sets forth the specific facts upon which the belief is reasonably based." *Brinkmeier v. BIC Corp.*, 733 F. Supp. 2d 552, 559 (D. Del. 2010) (quoting *Exergen Corp. v. Wal-Mart Stores, Inc*., 575 F.3d 1312, 1330-31 (Fed. Cir. 2009)).

21.     Bancomext alleges more than sufficient factual matter to put Defendants on notice as to the basis for its fraud claims. As to its fraudulent misrepresentation claims regarding the M&G Holding Credit Facility, the FAC alleges "who" made the fraudulent misrepresentations—Messrs. Perez Vazquez and Ghisolfi; "what" the misrepresentations were—that M&G Holding would use the M&G Holding Credit Facility exclusively to purchase PTA from DAK and that M&G International would repay Bancomext directly from the proceeds of the sale of such PTA; "when" such representations were made—in October and November 2009; and "where" they were made—in an email, in a PowerPoint presentation, and at a meeting in person. FAC ¶ 23-26.

22.     The FAC also alleges that M&G Holding, under the control of Defendants, made draws under M&G Holding Credit Facility; that those draws constituted representations that it would use loan proceeds as required by the M&G Holding Credit Agreement; that it knew at the time it made the draws that it was not going to use the funds for permitted purposes; and that those funds were, in fact, not used for permitted purposes. These allegations are more than sufficient to plead fraud, even under the standards of Civil Rule 9(b).

23.     In urging dismissal of Plaintiff's fraud counts, Defendants make numerous assertions that are simply wrong. For example, they claim the FAC fails to allege the representations Messrs. Perez Vazquez and Ghisolfi made to Bancomext were untrue. False. The FAC clearly states that, at the time they were made, "M&G Holding and Defendants either knew that such representations were false or were recklessly indifferent to the truth or falsity of such representations." FAC ¶ 97.

24.     Defendants also claim that the FAC does not allege "any facts to support the claim that Defendants were somehow inducing Bancomext to enter into [the M&G Holding Credit Agreement]."  Wrong again.  Bancomext alleges that M&G Holding and its affiliates requested a revolving line of credit from Bancomext; sent a detailed PowerPoint presentation outlining a transaction structure that it hoped Bancomext would find acceptable; brought one of their most senior executives—Mr. Ghisolfi—to an in-person meeting where he "reiterated the request" for the line of credit and stated that the line of credit would only be used in accordance with a specific structure consistent with Bancomext's function as an export-import bank; and that "[b]ased on the representations described above . . . Bancomext approved the financing requested by M&G Holding."  FAC ¶ 26.

25.     Defendants also mischaracterize Bancomext's fraud claims with respect to M&G Polimeros Credit Facility.  They argue that Bancomext has not established a fraud claim, because depositing loan funds into the Pooling Account does not constitute fraud.  This is a flimsy strawman.  Bancomext's fraud claim is not based solely on the deposit of funds into the Pooling Account.  The central allegations are that Defendants, and not M&G Polimeros, controlled the Pooling Account, and that Bancomext's loan proceeds were immediately thereafter *further* transferred by Defendants to their own bank accounts for their own use.  FAC ¶¶ 53-57.  This benefit serves as a compelling basis for Bancomext's belief with respect to Defendants' knowledge and intent in causing M&G Polimeros to solicit and enter into the M&G Polimeros Credit Agreement with Bancomext.

26.     In any event, that draws were immediately transferred to the Pooling Account was, in fact, part of Defendants' fraud because it allowed them to conceal the diversion of loan proceeds.  Bancomext alleges it was instructed to deposit loan proceeds into M&G Polimeros' individual checking account to give the false impression that M&G Polimeros would retain

control of the funds.  FAC ¶ 56.  Defendants' concealment of the Pooling Account itself supports a claim for fraud.  *See Sonneberg v. United States*, 2003 U.S. App. LEXIS 6503, at *11-12 (3d Cir. Apr. 4, 2003) (noting Supreme Court's recognition of active concealment as common law fraud: "simple 'good faith' imposes an obligation not to purposefully conceal material facts with intent to deceive"); *see also United States v. Colton*, 231 F.3d 890, 899 (4th Cir. 2000) ("The Supreme Court in *Stewart* carefully explained why concealment is 'equivalent to a false representation' and so appropriately forms the basis for a common law fraud action: 'the concealment or suppression is in effect a representation that what is disclosed is the whole truth. The gist of the action is fraudulently producing a false impression upon the mind of the other party; and if this result is accomplished, it is unimportant whether the means of accomplishing it are words or acts of the defendant, or his concealments or suppression of material facts not equally within in the knowledge or reach of the plaintiff.") (quoting *Stewart v. Wy. Cattle Ranche Co.*, 128 U.S. 383, 388 (1888)).  At the very least, the immediate transfer of loan proceeds from M&G Polimeros' individual account into the Pooling Account shows a clear intent to divert the funds for improper purposes.  M&G Polimeros would never have transferred loan proceeds into an account outside of its control if it intended to use the proceeds itself.

27.    Defendants further assert that the FAC does not allege that they made false statements to Bancomext.  The FAC clearly states that Defendants controlled M&G Polimeros and caused it to solicit the M&G Polimeros Credit Facility based on false representations (including those specifically stated in the Credit Agreement) "even though they never intended that M&G Polimeros would comply with such terms."  FAC ¶ 45.  Such statements directed by Defendants may properly be imputed to Defendants.  *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1373 (3d Cir. 1992) (statement of subsidiary may be attributed to its corporate parent where parent dominates activities of subsidiary).

28. For similar reasons, Defendants' attempt to direct all blame to the Mexican Entities does not absolve Defendants under the allegations of the FAC. Bancomext alleges more than twenty times that the wrongdoing occurred while the Mexican Entities were completely under Defendants' control. FAC ¶¶ 18, 19, 21, 39-42, 45, 52-53; 57-58, 62, 76, 83-85, 88-91, 92, 96-102, 108, 111-114, 117 & 131. The proceedings before this Court and specific factual allegations in the FAC bear this out. The Mexican Entities' counsel stated on the record that the Mexican Entities do not control their bank accounts, cannot access their own emails, do not have any independent officers or governance procedures, and do not observe any typical corporate formalities. *See, e.g.*, FAC ¶¶ 52, 76. In his words, "[the Mexican Entities] are a subsidiary. [They] don't make decisions the same way someone who is actually in charge of everything does." *Id.* at ¶ 76 (citing Feb. 22, 2018 Hr'g Tr. 43:5-11). Many of the officers and directors of the Mexican Entities hold similar titles at Defendants. FAC ¶¶ 20-21. As such, the FAC clearly alleges that Defendants either made the relevant fraudulent statements through their common fiduciaries or caused such statements to be made for their exclusive benefit.

29. Throughout their brief, Defendants turn a blind eye to specific allegations of their direct involvement in the fraud. Bancomext has clearly pleaded Defendants' specific motive to defraud Bancomext—that they needed money to fund the construction of the Corpus Christi plant and run their U.S. operations and turned to the cash flow and credit of the Mexican Entities to provide the necessary liquidity to keep them afloat. FAC ¶¶ 36-39. Defendants also ignore that from at least as early as August 2015 to the date the Altamira Plant was shuttered, Defendants immediately caused the proceeds of draws made under the Revolving Credit

Facilities to be transferred to them for their benefit.[7] FAC ¶¶ 53-62; Exs. E & F. ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████. FAC ¶ 55; Ex. E. Defendants' insinuations that they had nothing to do with the fraud is simply not plausible in light of the fact that they immediately received *all* of the proceeds drawn under those loans. In any event, Bancomext's robust allegations of Defendants' direct involvement and control must be accepted as true at this stage of these proceedings.[8]

30. Finally, Defendants attempt to blunt the force of Bancomext's allegations by introducing facts not alleged in the FAC—in particular that (a) during the September 1 through September 5, 2017 period in which Defendants caused $70 million of the M&G Holding Credit Facility to be drawn one last time, ████████████████████████████████, Dfts. Br. 8, 14; and (b) certain Defendants were net contributors to the Pooling Account during specific periods or upon the final reconciliation, *id.* at 7-8, 14-15.

31. With respect to the payment and draw on the M&G Holding Credit Facility in early September 2017, this churning is further evidence of Defendants' fraud. M&G International repaid the line for the purpose of keeping it open so that Defendants (as opposed to M&G Holding) could continue to have the benefit of the credit. The line was fully drawn, M&G International paid certain maturing revolving loans, but then *immediately thereafter* caused

---

[7] Defendants and the Committee chose to completely ignore evidence of these contemporaneous transfers set forth in Exhibits E and F. This omission is unsurprising, as the transfers set forth therein vividly illustrate Defendants' complete involvement in and control over the fraud perpetrated on Bancomext.

[8] Defendants cite to *Vexol S.A. de C.V. v. Berry Plastics Corp*, 2017 WL 4583515, *4 (S.D. Ind. May 17, 2017) to support their claim that the FAC fails to sufficiently plead Defendants' involvement in the fraud. Dfts. Br. 21. The only commonality between that case and the FAC is that the both involved a Mexican subsidiary of a U.S. corporation. The *Vexol* court specifically noted that the plaintiff had failed to provide a single fact explaining what role the U.S. parent played in causing the plaintiff harm. Here, Bancomext has pleaded, motive, control, participation, and benefit—that Defendants received $190 million of Bancomext's loan proceeds. Such factual allegations sufficiently demonstrate Defendants' involvement in the fraud.

M&G Holding to **redraw** the full amount that had been repaid and to immediately upstream the funds to M&G International, where the funds were used for improper purposes. Indeed, the funds were not used to pay DAK for PTA, as a few days later, DAK announced that it would no longer provide PTA to Defendants or the Mexican Entities due to non-payment. FAC ¶ 68. If M&G Holding had not made its improper final draw, Bancomext would have been repaid its loans at maturity and would no longer be owed those amounts. However, because of Defendants' fraud, Bancomext was damaged because the new draws that were improperly requested and diverted from M&G Holding were never repaid. Further, that payments were made and then immediately redrawn served to keep Bancomext off the scent of Defendants' fraud for a little bit longer—long enough to allow Defendants to drain the Mexican Entities' bank accounts, strip the Mexican Entities of Bancomext's valuable collateral and undo the Pooling Account prior to Defendants' bankruptcy filings.

32. With respect to the purported occasional "net contributor" status of certain Defendants, this is neither here nor there. As of the Petition Date, the FAC alleges—based upon the sworn testimony of Defendants' CRO—that the Mexican Entities had sent nearly $550 million to Defendants—including Bancomext loan proceeds—with no prospect of repayment. FAC ¶ 74. By reference to facts outside of the FAC, Defendants say certain of them were net contributors in a cherry-picked month—October 2015—and M&G Resins was a net contributor to the Pooling Account during the summer of 2017. These hand-picked snapshots of Pooling Account activity cannot serve as a basis for dismissing the FAC even if they were reliable (which they are not) because they do not show the whole picture—they show only what Defendants want the Court to see as helpful to them.

33. More fundamentally, that one or more Defendants may have been "net contributors" to the Pooling Account (which is far from clear and requires the Court to go

outside of the FAC) does not mean that the Mexican Entities received any benefit from that surplus. In fact, they did not. As alleged in the FAC and confirmed by counsel for the Mexican Entities, the Mexican Entities did not control the Pooling Account—Defendants did. FAC ¶ 52. At the end of the day, Defendants' CRO has confirmed under penalty of perjury that the Mexican Entities contributed approximately $550 million to Defendants prior to the Petition Date. Further, as alleged in the FAC, the Mexican Entities were left with no cash or working capital, their plant was shuttered on September 5, 2017, and the Mexican Entities were left insolvent with no ability to repay their creditors, including Bancomext.

34. In any event, the records Defendants present are demonstrably unreliable. Defendants ask the Court to take judicial notice of M&G Resins' schedules to show that, in accordance with its claimed net contributor status to the Pooling Account, M&G Resins was owed $28.7 million by M&G Polimeros on the Petition Date. Dfts. Br. 8 & n.7. This is directly contradicted by Mr. Stogsdill's declaration [Banrk. D.I. 143 Ex. 1] that purports to list all intercompany obligations but makes no reference to an obligation from M&G Polimeros to M&G Resins.[9]

**B. Bancomext Has Adequately Pleaded a Claim for Aiding and Abetting Fraud**

35. The elements of aiding and abetting fraud under New York and Delaware law are (1) the existence of an underlying fraud; (2) knowledge of the fraud on the part of the aider and

---

[9] The amended exhibit to Mr. Stogsdill's declaration lists both obligations owed by non-Debtor affiliates to Debtors (e.g. a $200 million debt owed by Debtor M&G International to non-Debtor M&G Finanziaria S.p.A.) and obligations owed by Debtors to non-Debtor affiliates (e.g. a $354 million debt owed by Debtor M&G USA to non-Debtor M&G Polimeros). The purported obligation of M&G Polimeros to Debtor M&G Resins reflected on M&G Resins' schedule is conspicuously absent. ▇▇▇▇ ▇▇ Under Defendants' cited authority, the Court cannot take judicial notice of M&G Resins' schedules because Defendants themselves have created a dispute about their reliability. *See In re Popple*, 532 B.R. 581, 585 (Banrk. M.D. Pa. 2015) (taking judicial notice only of "the contents of the bankruptcy schedules and statements *which are not in dispute*") (emphasis added).

abettor; and (3) substantial assistance by the aider and abettor in achievement of the fraud. *See Unicredito Italiano v. JPMorgan Chase Bank*, 288 F. Supp. 2d 485, 502 (S.D.N.Y. 2003); *PR Acquisitions v. Midland Funding*, 2018 Del. Ch. LEXIS 137, at \*39 (Del. Ch. April 30, 2018).

36.     Defendants question whether an aiding and abetting fraud claim can be brought under Texas and Michigan law.  While the Michigan Supreme Court has never expressly recognized a common-law claim for aiding and abetting tortious conduct, the Michigan Court of Appeals and the Sixth Circuit have each done so in several contexts, including fraud. *See El Camino Res., Ltd. v. Huntington Nat'l Bank*, 712 F.3d 917, 922 (6th Cir. 2013) (finding that "the Michigan Supreme Court . . . would adopt the approach of aiding and abetting as set forth in § 876(b) of the Restatement (Second) of Torts.").  Similarly, Texas appellate courts and the Bankruptcy Court for the Southern District of Texas have found that Texas law would recognize a claim for aiding and abetting fraud. *See Ogle v. Comcast Corp.* (*In re Houston Reg'l Sports Network, L.P.*), 547 B.R. 717, 759 (Bankr. S.D. Tex. 2016) ("This Court is persuaded that Texas would recognize the tort of aiding and abetting fraud."); *see also Crisp v. Sw. Bancshares Leasing Co.*, 586 S.W.2d 610, 613 (Tex. App. 1979).  When analyzing an aiding and abetting fraud claim, Michigan and Texas courts apply the Restatement (Second) of Torts approach, which contains substantially similar elements as a claim under New York and Delaware law. *Houston Reg'l Sports Network*, 547 B.R. at 759; *El Camino Res.*, 712 F.3d at 922.

37.     As explained above, the FAC states a claim for fraud against Defendants with the particularity required by Civil Rule 9(b).  However, to the extent the Court finds that Defendants are not directly liable for that fraud, they are clearly liable for aiding and abetting the Mexican Entities' fraud.

38.     The FAC clearly sets forth the underlying fraud claim against the Mexican Entities with the specificity required by Civil Rule 9(b).  Through their complete control of the

Mexican Entities, Defendants caused the Mexican Entities to make material promises to Bancomext in order to induce it to enter into credit agreements, lend funds, and continue to honor draws under the Revolving Credit Facilities. *See, e.g.*, FAC ¶¶ 83, 88, 92 & 96-102. The Mexican Entities never intended to honor those promises. *See, e.g.*, FAC ¶¶ 84, 88, 97 & 99. That fact is evidenced by M&G Holding's failure to repay the M&G Holding Credit Facility in the manner agreed upon by the parties and, after entering into the M&G Polimeros Credit Facility, M&G Polimeros' immediate transfer of draws to Defendants. FAC ¶¶ 54-62, 97 & Exs. E & F. Bancomext relied on those representations when issuing the Revolving Credit Facilities and continuing to honor the Mexican Entities' draw requests thereunder. *See, e.g.*, FAC ¶¶ 86, 93 & 103. Ultimately, Bancomext was harmed when the Mexican Entities could not repay the $190 million outstanding balance under the Revolving Credit Facility. FAC ¶¶ 94, 109.

39. As set forth in greater detail above, the allegations of the FAC are that Defendants had knowledge of the fraudulent scheme. The Court need look no further than Defendants' full control of the Mexican Entities and their clear motive to defraud Bancomext to find the knowledge element of aiding and abetting satisfied. *See Cohen*, 25 F.3d at 1174 (denying a motion to dismiss where the complaint "spelled out circumstances from which it could easily be inferred that the [defendants] had a motive to make false representations").

40. Finally, the FAC contains allegations that Defendants provided substantial assistance in committing the fraud. Substantial assistance exists "where (1) a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed, and (2) the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated." *Unicredito Italiano*, 288 F. Supp. 2d. at 502.

41. Defendants were intricately involved in each aspect of the fraud. *See ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 412 (S.D. Tex 2008) (parent corporation provided

substantial assistance with respect to its subsidiaries' breach of fiduciary duty when it was "intricately involved in every aspect of the transaction").   They caused the Mexican Entities to solicit $190 million of loans from Bancomext.  FAC ¶¶ 22, 41.  They made or caused the Mexican Entities to make material misrepresentations to Bancomext to induce it to make the loans and honor draw requests.  FAC ¶¶ 88, 92, 97, & 99.  And, they then caused the Mexican Entities to immediately transfer the proceeds to Defendants.  *Id.* at ¶¶ 52-62, Exs. E & F.

42.     Importantly, courts have denied motions to dismiss aiding and abetting claims when it is alleged, as it is here, that a parent corporation used its complete control of its subsidiary to cause that subsidiary to enter into a transaction rendering it insolvent, and the parent reaped a windfall as a result.  *See U.S. Bank N.A. v. Verizon Commc'ns, Inc.*, 817 F. Supp. 2d 934, 945 (N.D. Tex. 2011) (denying a motion to dismiss an aiding and abetting fiduciary duty on these allegations).

43.     Moreover, Defendants clearly provided "substantial assistance" by causing the transfers of Bancomext's loan proceeds to themselves in contravention of the promises made to Bancomext.  FAC ¶¶ 49-62.  Specifically, Defendants caused the Mexican Entities to deposit all of the proceeds of the Revolving Credit Facilities into the Pooling Account controlled by Defendants.  FAC ¶¶ 50-53.  Defendants then used their control of the Pooling Account to immediately transfer all of the proceeds to themselves.  FAC ¶¶ 52-62, Exs. E & F.

44.     But Defendants' diversion of the proceeds of the Revolving Credit Facilities to themselves, such proceeds would have remained at the Mexican Entities and would have been available to fund, among other things, the amounts needed to pay their key supplier and repay Bancomext.  FAC ¶ 50.  Moreover, Defendants' use of the Pooling Account concealed the fact that the proceeds were being transferred to Defendants.  FAC ¶¶ 50-51.  That fact alone

constitutes substantial assistance.  *See Unicredito Italiano*, 288 F. Supp. 2d. at 502 (substantial

assistance occurs where aiding and abetting defendant helps conceal the fraud).

45.     By the MTD, Defendants would have the Court believe that they had no part in

receiving $190 million of Bancomext's loan proceeds from the Mexican Entities.  This strains

credulity and, more importantly, is contrary to the FAC's allegations that must be taken as true.

46.     Make no mistake, the fraud set forth in the FAC was perpetrated by and for the

exclusive benefit of the Defendants.  However, to the extent that the Court finds that it was not,

there is no doubt that they aided and abetted in committing such fraud.  The FAC alleges as

much.  It is simply not plausible to believe that the Mexican Entities gratuitously transferred

$190 million of ill-gotten money to Defendants out of the kindness of their hearts, without the

substantial assistance of Defendants, or that Defendants received $190 million without any

knowledge of where it came from or what was said and done to obtain that money.  The MTD

should be denied as to the aiding and abetting fraud count of the FAC.

### C.  Bancomext Has Adequately Pleaded a Claim for Civil Conspiracy

47.     To establish a claim for civil conspiracy under Delaware law, a plaintiff must

demonstrate (1) a combination of two or more persons; (2) an unlawful act done in furtherance of

the conspiracy; and (3) actual damage.  *Szczerba v. Am. Cigarette Outlet, Inc.*, 2016 Del. LEXIS

278, at *5 (Del. Super. April 1, 2016).[10]

---

[10]     Under New York, Texas, and Michigan law the elements of a civil conspiracy are substantially similar.  *See Abacus Fed. Sav. Bank v. Lim*, 75 A.D.3d 472, 474 (N.Y. App. 2010) (the elements of civil conspiracy under New York law are: (1) a primary tort; (2) an agreement between two or more parties; (3) an overt act in furtherance of the agreement; (4) the parties' intentional participation in furtherance of the plan or purpose; and (5) resulting damage or injury); *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 257 Mich. App. 365, 384 (Mich. App. 2003) (civil conspiracy under Michigan law is a combination of two or more persons, by some concerted action, to accomplish an unlawful purpose, or accomplish a lawful purpose by criminal or unlawful means); *Anderton v. Cawley*, 378 S.W.3d 38, 60 (Tex. App. 2012) (the elements of civil conspiracy under Texas law are (1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result).

48.     Courts have recognized that the nature of conspiracies often make it impossible to provide details at the pleading stage such that adjudication before discovery is generally inappropriate. *Id.* at *6; *see also Greenfield v. Tele-Commc'ns, Inc.*, 1989 Del. Ch. LEXIS 49 at *8 (Del. Ch. 1989) ("[C]onspiracies are secret agreements and the law cannot expect a plaintiff, in order to state a non-dismissible claim, to plead evidentiary matters which, if true, would establish the conspiracy."). Moreover, a plaintiff need not plead the existence of an explicit agreement; rather, a conspiracy can be inferred from the behavior of the alleged conspirators. *LVI Grp. Invs., LLC v. NCM Grp. Holdings, LLC*, 2018 Del. Ch. LEXIS 101, at *42 (Del. Ch. Mar. 28, 2018); *see also In re Bracket Holding Corp. Litig.*, 2017 Del. Super LEXIS 377, at *29 (Del. Super. July 31, 2017) (denying motion to dismiss conspiracy claim where complaint alleged facts from which defendants' knowing participating in the underlying fraud could be inferred). Nevertheless, a complaint must at least allow a court to determine that a valid claim has been stated. Here, the FAC's allegations clearly state a claim for conspiracy.

49.     As set forth in the FAC, in the summer of 2015, Defendants had run out of money and exhausted all available credit. FAC ¶¶ 36-39. In order to get the funds needed to keep their floundering U.S. operations afloat, Defendants hatched a scheme to use the Mexican Entities to defraud Bancomext into issuing them $70 million of credit and then absconded with both that credit and the $120 million already loaned by Bancomext under the M&G Holding Credit Facility. *Id*. at ¶¶ 89-92. As set forth above, the FAC details that fraud with the particularity required by Civil Rule 9(b). The FAC also details that once the Mexican Entities received the ill-gotten proceeds from Bancomext, Defendants caused such proceeds to be immediately transferred to themselves through their control of the Pooling Account. *Id.* at ¶¶ 49-62. Each of those transfers, including the date, recipient, and amount are set forth on Exhibits E and F to the FAC. *Id.* at Exs. E & F. Each transfer is sufficient to meet the overt act requirement of a claim

for conspiracy. Moreover, the factual allegations set forth in the FAC conclusively demonstrate both Defendants' knowledge and agreement to the scheme.

50.    In sum, Defendants' arguments that Count IV should be dismissed because the FAC does not allege that Defendants participated in the fraud, acted in concert with the Mexican Entities, or acted with intent to defraud Bancomext, must be denied.

### D. Bancomext Has Adequately Pleaded a Claim for Actual Fraudulent Transfer

51.    Under New York, Michigan, Delaware, and Texas law, a transfer may be avoided as a fraudulent conveyance if made with the actual intent to hinder, delay, or defraud either present or future creditors. *See* NYDCL § 276; 6 Del. C. § 1304; MCL 566.34(1)(a); Tex. Bus. & Com. Code Ann. § 24.005(a)(1). Actual fraudulent intent may be inferred from the circumstances surrounding the transaction, often referred to as badges of fraud. *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 639 (2d Cir. 1995).

52.    The uniform fraudulent transfer act, which has been adopted by Delaware, Michigan, and Texas, provides a non-exclusive list of badges of fraud. They are:

- The transfer or obligation was made or incurred to an insider;
- The debtor retained possession or control of the property transferred after the transfer;
- The transfer or obligation was undisclosed or concealed;
- Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
- The transfer was of substantially all of the debtor's assets;
- The debtor absconded;
- The debtor removed or concealed assets;
- The value of the consideration received was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
- The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
- The transfer occurred close to the time a substantial debt was incurred; and
- The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*See, e.g.*, 6 Del. C. § 1304(b); MCL 566.34(2); Tex. Bus. & Com. Code Ann. §24.005(b). Additionally, courts have found actual fraudulent intent may be inferred when the debtor transferred and absconded with funds immediately after their receipt. *See In re Kaiser*, 722 F.2d at 1582; *In re Zambrano Corp.*, 478 B.R. at 691.

53. "It is not necessary that all of the factors support a finding of actual intent." *Dryden v. Estate of Gallucio*, 2007 Del. Ch. LEXIS 9, at *20 (Del. Ch. Jan. 11, 2007). Rather, "the confluence of several [factors] in one transaction generally provides conclusive evidence of an actual intent to defraud." *VFB LLC v. Campbell Soup Co.*, 2005 U.S. Dist. LEXIS 19999, at *110 (D. Del. Sept. 13, 2005), *aff'd*, 482 F.3d 624 (3d Cir. 2007) *see also Bentley v. Caille*, 289 Mich. 74, 78 (1939) (finding under Michigan law that "a concurrence of several badges will always make out a strong case [for actual fraudulent transfer]").

54. From mid-June through early-September 2017, the Mexican Entities requested and received $190 million of draws under the Credit Facilities. FAC ¶ 117, Exs. E & F. Upon each draw, the Mexican Entities immediately transferred those funds to Defendants with the actual intent to hinder, delay and defraud Bancomext and the Mexican Entities' other creditors. *Id.* at ¶ 118.

55. Defendants' only argument that Bancomext's actual fraudulent transfer claim should be dismissed is that Bancomext has failed to allege the specifics of the transaction, including which Defendants received such transfers. Dfts. Br. at 29. Defendants draw this argument to its illogical limits, stating that when Mr. Stogsdill admitted that Bancomext's loan proceeds had been sent to the United States he did not necessarily mean they had been sent to Defendants, as he might have been referring to some other American entity. *Id.* at 30 n.34. This ill-conceived argument highlights the futility of Defendants' position with respect to Bancomext's claims for fraudulent transfer and belies the specific allegations of the FAC.

56.     As stated before, the FAC clearly identifies the purpose of the fraudulent

transfers: to provide necessary cash for Defendants' failing U.S. operations.  *See* FAC ¶¶ 36-39.

Moreover, contrary to Defendants' contentions, Exhibits E and F to the FAC specifically identify

the date, amount, and recipient of each transfer of which Bancomext is aware and alleges to be

fraudulent.  Each such transfer went to one of the Defendants.

57.     Importantly, Defendants do not argue that Bancomext failed to allege actual intent

to hinder, delay, and defraud the Mexican Entities' creditors.  This is unsurprising, as the

numerous badges of fraud alleged provide "conclusive evidence" of that intent.  *VFB LLC v.*

*Campbell Soup Co.*, 2005 U.S. Dist. LEXIS 19999, at *32.  Specifically, Bancomext alleges:

- The transfers were made to an insider (the Mexican Entities' corporate affiliates), *see,* *e.g.*, FAC ¶¶ 17, 53-57; *see, e.g.*, 6 Del. C. § 1301(7)(d) ("an [i]nsider includes: . . . (d) An affiliate or an insider of an affiliate as if the affiliate were the debtor");
- The transfers were not disclosed until well after they were consummated, *see, e.g.*, FAC ¶ 103; *compare* FAC, Exs. E & F to *Notice of Revised Exhibit to First Day Decl.* [Banrk. D.I. 143];
- The Mexican Entities received an unsecured intercompany claim from insolvent entities that were actively planning for bankruptcy—clearly less than reasonably equivalent value, *see, e.g.*, FAC ¶ 132;[11]
- Defendants absconded with Bancomext's loan proceeds immediately after they were drawn by the Mexican Entities (*i.e.* after a large indebtedness was incurred), *see, e.g.*, FAC ¶¶ 65-71; and
- The transfers occurred shortly before the Mexican Entities shuttered the Altamira Facility and Defendants sought chapter 11 protection, *see* FAC ¶¶ 79-80.

Moreover, Defendants' fraudulent intent was confirmed by Mr. Stogsdill, who, when pressed,

advised Bancomext's officials that Bancomext's loan proceeds had been sent to the United States

and were out of Bancomext's reach.  FAC ¶ 119.  Collectively, these facts more than plausibly

---

[11]    The Debtors appear to have booked all intercompany claims from the Mexican Entities at M&G USA, an entity with no tangible assets.  Based on the bank records provided to date, Bancomext has been unable to identify any substantial transfers from either Mexican Entity to M&G USA.  These facts support the inference that M&G USA was specifically selected to limit the Mexican Entities' remedies with respect to the transfers.

support the conclusion that Defendants intended to hinder, delay, and defraud Bancomext when they transferred Bancomext's loan proceeds to Defendants.

### E. Bancomext Has Adequately Pleaded a Claim for Constructive Fraudulent Transfer

58.     Unlike its claims for actual fraudulent transfer, Bancomext's "constructive fraudulent transfer claims are governed by [Civil] Rules 8 and 12(b)(6) and not the heightened [Civil] Rule 9(b) pleading standard." *Charys Liquidating Tr. v. McMahan Sec. Co.* (*In re Charys Holding Co*.), 443 B.R. 628, 632 n.2 (Bankr. D. Del. 2010).

59.     Like Bancomext's actual fraudulent transfer claims, the only argument that Defendants raise in defense is that Bancomext failed to plead who received the transfers, in what amount, and under what circumstances.  Dfts. Br. at 29.  As stated above, that argument ignores the facts pleaded in the FAC that specifically answer all of Defendants' questions.  The FAC plainly states a claim for constructive fraudulent transfer.

60.     Under each potentially relevant state law, a transfer is deemed constructively fraudulent if: (1) it was made without fair consideration; and (2) the debtor was either insolvent or rendered insolvent by the transfer.  *See* NYDCL § 276; 6 Del. C. § 1305; MCL § 566.34; Tex. Bus. & Com. Code § 24.005.  Despite the similarity in terms, the pleading requirements for fraud are not applicable to allegations of constructive fraudulent conveyance.  *See China Res. Prods. (U.S.A.) Ltd. v. Fayda Int'l.*, 788 F. Supp. 815, 818 (D. Del. 1992).

61.     Here, the relevant transfers sent actual dollars to Defendants in exchange for intercompany notes from entities with no assets that were insolvent and about to file for bankruptcy protection.  FAC ¶ 132.  As such, each transfer was made for less than reasonably equivalent value.  *Id.*  Additionally, the transfers were made when the Mexican Entities' remaining assets were unreasonably small in relation to their business.  Indeed, shortly after the majority of the transfers, and during the same week that $70 million was transferred, Defendants

caused the Mexican Entities to shutter the Altamira Plant. *Id*. at ¶¶ 67-71. The MTD with respect to Bancomext's constructive fraudulent transfer claims should be denied.

### F. Bancomext Has Adequately Pleaded a Claim for Conversion

62. Conversion is the "act of dominion wrongfully exerted over the property of another, in denial of his right, or inconsistent with it." *McGowan v. Ferro*, 859 A.2d 1012, 1040 (Del. Ch. 2004). To state a claim for conversion, a plaintiff must allege that: (1) it had a property interest in the property; (2) it had a right to possess such property, and (3) defendant wrongfully possessed or disposed of such property as if it were its own. *Isr. Disc. Bank of N.Y. v. First State Depository Co.*, 2013 Del. Ch. LEXIS 136, at *60 (Del. Ch. May 29, 2013).[12]

63. The FAC clearly states facts that establish the elements of a conversion claim against the Defendants. Specifically, under the M&G Holding Credit Agreement, Bancomext received a security interest in certain accounts receivable owed by M&G International to M&G Holding. FAC ¶ 30. Similarly, under the M&G Polimeros Credit Agreement, Bancomext received a security interest in M&G Polimeros' inventory and certain accounts receivable M&G Polimeros was owed by M&G Polymers USA. FAC ¶ 46. A security interest is a property interest. *See, e.g.*, *In re Kressler*, 40 F. App'x 712, 713 (3d Cir. 2002) (recognizing "long-standing rule in bankruptcy that a lien is a property interest"). Bancomext had an immediate right to possess its collateral after the Mexican Entities defaulted under the Revolving Credit Facilities. FAC ¶¶ 123, 126; *see also Fleet Capital*, 2002 U.S. Dist. LEXIS 18115, at *77 (New York law) ("The law is clear that [upon default] a secured lender may take possession without

---

[12] The elements of a conversion claim are similar under all potentially applicable state laws. *See Fleet Capital Corp. v. Yamaha Motor Corp.*, 2002 U.S. Dist. LEXIS 18115, at *51 (S.D.N.Y. Sept. 25, 2002) (New York law) (to state a cause of action for conversion a plaintiff must establish title, possession or right to possession, or some property interest in the subject matter which plaintiff claims the defendants converted to their own use); *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971) (same); *Dep't of Agric. v. Appletree Mktg., L.L.C.*, 779 N.W.2d 237, 244-45 (Mich. 2010) (same).

declaring a default and, indeed, without notice of any kind."). Despite Bancomext's explicit instruction that Defendants turn over such property, Defendants wrongfully absconded with Bancomext's collateral. FAC ¶¶ 73, 124 & 127. That much is plainly evident from the fact that Bancomext's inventory collateral had significant value immediately prior to the closure of the Altamira Facility, however, when its representative inspected the Altamira Facility after it was closed, much of the inventory had been liquidated and the Mexican Entities had no cash or accounts receivable to show for it. FAC ¶¶ 64, 72.

> **i.   Bancomext's Conversion Claim Is Not a Claim for Breach of Contract**

64.    Defendants argue that Bancomext's conversion claim must fail because it arises "solely out of a breach contract." Dfts. Br. at 31. That is not the case. Rather, by Count VI of the Complaint, Bancomext asserts a claim for conversion against the Defendants on account of *their* wrongful control and disposition of Bancomext's collateral. FAC ¶¶ 121-128. Defendants will be the first to inform the Court that they did not have a contract with Bancomext. As such, Bancomext's conversion claim clearly pleads unlawful and wrongful acts of conversion by the Defendants that are distinct from violations of contract rights. *See Fabry's S.r.L. v. IFT Int'l, Inc.*, 2003 U.S. Dist. LEXIS 8597, at \*11-12 (S.D.N.Y. May 21, 2003) (finding a conversion claims exists when a plaintiff shows acts that were unlawful or wrongful as opposed to mere violations of contractual rights).

> **ii.   Bancomext Has Pleaded a Specific Interest in Property that Is the Proper Subject of a Claim for Conversion**

65.    Defendants also argue that Bancomext has not specifically identified the property subject to its conversion claim and that a claim for the conversion of accounts receivable fails as a matter of law. Dfts. Br. at 32-33 n.37. Those arguments are without merit.

66.     As an initial matter, Bancomext's conversion claims are subject to the pleading requirements of Civil Rule 8(a).  *Barrett v. Tallon*, 30 F.3d 1296, 1301 (10th Cir. 1994).  As such, the FAC need only contain allegations sufficient to put Defendants on notice as to Bancomext's claim.  Fed. R. Civ. P. 8(a)(2).  Here, the FAC clearly identifies the specific accounts receivable and inventory collateral that are the proper subject of a conversion claim.

67.     As described above, Bancomext's conversion claims concern certain receivables that M&G Polymers USA owed to M&G Polimeros pursuant to that certain Product Supply Agreement dated February 1, 2004 and accounts receivable owed by M&G International to M&G Holding that had been assigned to Bancomext to secure the Revolving Credit Facilities.  FAC ¶¶ 30, 46 & 122.  Those specific accounts receivable are the proper subject of a conversion claim.  *See Pioneer Commercial Funding Corp. v. United Airlines, Inc.*, 122 B.R. 871, 884-85 (S.D.N.Y. 1991) ("[Plaintiff] is not simply alleging the conversion of money through failure to satisfy a debt, but rather, is claiming the conversion of funds represented by accounts receivable held at [the defendant] on its behalf.  This distinction is not merely a matter of semantics since these receivables, while resulting from accounting entries, nevertheless represent tangible, marketable assets which can be sold, secured, or traded."); *see also Indep. Discount Corp.*, 365 N.Y.S. 2d 44, 46 (2d Dept. 1975) (finding there is no prohibition on instituting a conversion claim for money, provided it is specific money).[13]

68.     Bancomext's allegations that Defendants converted its inventory collateral are also sufficient to meet the pleading requirements of Civil Rule 8.  *See Wachovia Bank v. Metro Automation*, 2009 U.S. Dist. LEXIS 40415, at *6-7 (Bankr. N.D. Tex. May 13, 2009) ("With respect to the argument that the Complaint must allege what specific Collateral was converted,

---

[13]     Moreover, specifically identifiable funds can be the subject of a conversion action even if they are not segregated or held in a separate account.  *See Moses v. Martin*, 360 F. Supp. 2d 533, 541-42 (S.D.N.Y. 2004).

Defendants again seek to place more stringent demands on the Complaint than the Federal Rules require. Plaintiff has alleged that the inventory and equipment identified in the security agreements was wrongfully converted. Defendants have control over the Collateral, and thus know what occurred. Requiring a more definite statement is unnecessary.").

### iii. Defendants Refused Bancomext's Demands to Turn Over Its Collateral

69.     Finally, Defendants argue that Bancomext's conversion claim is barred because Defendants did not refuse to return Bancomext's collateral. That is patently false.

70.     On September 29, 2017, Bancomext sent a letter to M&G Polymers USA demanding that M&G Polymers USA "make any payments due derived from the Collection Rights, in favor of Bancomext . . . ." *See* Bankr. D.I. 1116 at Ex. 7. Similarly, on October 19, 2017, Bancomext served M&G International with a formal demand to, among other things, pay any amounts owed to Bancomext derived from receivables it had been assigned pursuant to the M&G Holding Credit Agreement. *Id.* at Ex. 6. Finally, upon the closure of the Altamira Facility, Bancomext officials inspected the property and demanded payment on account of their inventory collateral. FAC ¶ 72.

71.     Bancomext has received no payment on account of its demands. Rather, after the Mexican Entities defaulted under the M&G Polimeros Revolving Credit Facility, Defendants wrongfully disposed of Bancomext's account receivable and inventory collateral. FAC ¶¶ 124, 127. As such, the Court should deny the MTD as to the conversion claims.

### G. To the Extent the Court Has Jurisdiction to Consider the MTD as to the Constructive Trust Claim, It Must Be Denied

#### i. The Court Lacks Jurisdiction to Determine Bancomext's Constructive Trust Claim During the Pendency of Bancomext's Appeal of the Sale Order

72.     The Committee urges the Court to apply the "law of the case" doctrine and find that the Sale Order precludes the fixing of a constructive trust on the $50 million cash proceeds

of the Corpus Christi Assets that the Committee refers to as the "**GUC Pool**." It is because of

the relationship between the Sale Order and the motion to dismiss Plaintiff's constructive trust

claim that the Court cannot rule on the constructive trust claim at all. Plaintiff's pending appeal

of the Court's March 29, 2018 order [Bankr. D.I. 1300] (the "**Sale Order**") divests the Court of

jurisdiction to do so.

73.     "Generally, a notice of appeal divests the lower court of jurisdiction over those

matters on appeal." *In re G-I Holdings, Inc.*, 568 B.R. 731, 763 (Bankr. D.N.J. 2017) (citing

*Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982); *Venen v. Sweet*, 758 F.2d 117,

120 (3d Cir. 1985)). "'The filing of a notice of appeal is an event of jurisdictional significance—

it confers jurisdiction on the court of appeals and divests the district court of its control over

those aspects of the case involved in the appeal.'" *Id.* (quoting *Griggs*, 459 U.S. at 58). Known

as the "divestiture rule," its purpose is to "preven[t] confusion and inefficiency which would of

necessity result were two courts to be considering the same issue simultaneously." *Venen*, 758

F.2d at 121. So that the appellate process may properly function, "an appeal of a bankruptcy

order will not only divest the bankruptcy court of jurisdiction if the issues on appeal are identical

to the issues presently before the bankruptcy court, but also if the bankruptcy court's

determination of the issues before it would interfere with or undermine the appellate process."

*G-I Holdings*, 568 B.R. at 764.

74.     The prohibition on interfering with the appellate process necessarily extends to

interference with appellate jurisdiction. *Id.* at 769 (declining to decide matter that "would

interfere with the jurisdiction of the appellate court" in pending related appeal); *see also In re*

*Prudential Lines, Inc.*, 170 B.R. 222, 243 (S.D.N.Y. 1994) ("a lower court may take no action

which interferes with the appeal process or with the jurisdiction of the appellate court").

75.     An appellate court lacks jurisdiction to consider an appeal that is moot.  *In re Abbotts Dairies*, 788 F.2d 143, 150 n.6 (3d Cir. 1986).  Thus, under the divestiture rule, a bankruptcy court cannot enter an order that would moot the pending appeal of an earlier order.  *In re Allustiarte*, 1990 U.S. App. LEXIS 21058, at *6 (9th Cir. Dec. 4, 1990) (reversing determination that bankruptcy court had jurisdiction to enter order which would have the effect of mooting appeal of earlier order); *Chesapeake Tr. v. Chesapeake Bay Enter., Inc.* (*In re Potomac Supply Corp.*), 2016 Bankr. LEXIS 509, at *14 (Bankr. E.D. Va. Feb. 18, 2016) (recognizing lack of jurisdiction to enter order that would have effect of mooting pending appeal); *In re Norris Grain Co.*, 167 B.R. 258, 260 (Bankr. M.D. Fla. 1994) (finding no jurisdiction over motion to dismiss case where "ruling on the motion [would] moot the appeal in the related adversary proceeding"); *accord G-I Holdings*, 568 B.R. at 769 (declining to decide matter that "would interfere with the jurisdiction of the appellate court" in pending appeal).

76.     Defendants, as joined by the Committee, ask the Court to dismiss Plaintiff's constructive trust claim with prejudice.  Plaintiff's request for adequate protection, the Court's denial of which is the subject of the pending appeal, rested on its right to due process in resolving its disputed constructive trust claim.  If the Court were to dismiss Plaintiff's constructive trust claim, it would render the appeal moot.  The Court therefore lacks jurisdiction to consider the MTD as to the constructive trust claim under the divestiture rule.

77.     Further, while procedurally different settings, the motion to dismiss the constructive trust claim and the appeal of the Sale Order present overlapping identical issues, further requiring application of the divestiture rule.  The primary issue on appeal is whether the Court erred in finding that Bancomext failed to meet its burden "of demonstrating the validity of its interest in the assets sold pursuant to the sale order."  [Bankr. D.I. 1402].  The asserted basis of the interest was Plaintiff's constructive trust claim, which it rested on the allegations of

Bancomext's initial complaint [Adv. D.I. 1]. Defendants attacked Plaintiff's request on the same grounds as they now attack the claim in the MTD. And, the Court denied Bancomext's request on the grounds that Bancomext failed to establish a constructive trust by the allegations in the Initial Complaint. Indeed, the Committee agrees that the MTD and the appeal raise the same issues. *See* Committee Joinder, 9 ("If Bancomext wishes to undo this Court's prior orders that the GUC Pool is to be funded free of encumbrances and used solely to benefit unsecured creditors, the proper path for it to do so is the appellate process that it has commenced."). The divestiture rule prevents "two courts [from] considering the same issue or issues simultaneously." *Venen*, 758 F.2d at 121. It must operate here.

78. Even if the Court now had jurisdiction to determine Plaintiff's constructive trust claim, it would not be bound to dismiss under the law of the case doctrine because doing so would result in a manifest injustice. The nub of the matter is whether Plaintiff can pursue a constructive trust over the $50 million proceeds of the Corpus Christi Assets constituting the GUC Pool. The Sale Order denied Plaintiff that ability—effectively eliminating Plaintiff's right in the property—without the full and fair opportunity required by Bankruptcy Rule 7001(2). *See SLW Capital, LLC v. Mansaray-Ruffin* (*In re Mansaray-Ruffin*), 530 F.3d 230, 238-39 (3d Cir. 2008) (adversary proceeding required to determine interest in property).[14] To bootstrap that

---

[14]   Plaintiff recognizes that *SLW Capital* may have been overruled at least with respect to matters determined pursuant to confirmed plans rather than by an adversary proceeding. *See Thomas v. City of Phila.* (*In re Thomas*), 497 B.R. 188, 206 n.33 (Bankr. E.D. Pa. 2013) (noting that *SLW Capital* "may have been overruled in part by the Supreme Court's decision in *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260 (2010)"). Even if it were overruled to the extent that failure to comply with Bankruptcy Rule 7001(2) is no longer a violation of due process *per se*, Bancomext's due process rights were violated in this case nonetheless, as Defendants conspired to deny Bancomext information necessary to establish its claim while pursuing an unnecessarily compressed schedule for obtaining approval of the sale of the Corpus Christi assets. Among other things, Defendants refused to cause the Mexican Entities to provide information on Bancomext's request, and to which Bancomext was entitled by contract, in January. They further caused the Mexican Entities ignore the Court's 2004 order in March, further depriving Bancomext of information relevant to its claims and request for adequate protection. Had Bancomext simply been afforded conventional adequate protection with the right to proceed and pursue discovery on an adversary proceeding schedule as required by the Bankruptcy Rules, its due process would not have been denied.

deprivation of due process into a "law of the case" that would deprive Plaintiff of its rights on the Appeal, too, is manifestly unjust.

      **ii.**    **Bancomext Has Adequately Pleaded a Constructive Trust over the Corpus Christi Assets to the Extent of Its Fraudulently Obtained Loan Proceeds Used for Their Acquisition or Improvement**

           **1.**    **Bancomext's Constructive Trust Claims Are Not Time Barred**

                  **A.**  **The Final DIP Order Does Not Bar Bancomext from Pursuing Its Constructive Trust Claim Against the GUC Pool**

79.     The Committee asserts that Bancomext cannot assert its constructive trust in the Corpus Christi Assets because it failed to mount a timely challenge to Defendants' stipulations that Inbursa and its affiliated DIP lender enjoyed first priority liens in the Corpus Christi Assets. Although Bancomext takes issue with this position because it was not provided notice of the DIP motion and the DIP Order extends only to property of Defendants' estates (and therefore not to property excluded from the estates pursuant to 11 U.S.C. § 541(d)), it limited its adequate protection request to having its constructive trust interest attach to the GUC Pool, as to which Inbursa and the DIP lender waived their liens.

80.     The Committee argues that Bancomext cannot "pick and choose which proceeds are included in its alleged trust" because trust funds traced to a specific property subject the entire property to the trust under Texas law, such that "any claim Bancomext asserts for a constructive trust on the GUC Pool must logically seek a constructive trust on the First Lien Payment." Committee Joinder, 13. The Committee's logic is corrupted by its intended end. The DIP Order did not provide that Inbursa's and the DIP lender's liens in the subject assets were *exclusive*; it provided only that they were first priority. Therefore, the DIP Order did not terminate Bancomext's interests in assets subject to the liens; it provided merely that the liens trumped Bancomext's interests. However, Inbursa and the DIP lender's agreement to waive

their liens in the GUC Pool rendered the GUC Pool free of all consensual liens, with the result being that—had it been recognized by the Court at the Sale Hearing—Bancomext's interest would have stood alone. The DIP Order is no impediment to Bancomext's assertion of an interest in the GUC Pool. In any event, just because Texas law subjects an entire property to a trust does not mean that the beneficiary cannot waive its interest in any portion of the proceeds of that property. Generally, a creditor is free to exercise or not exercise its rights in collateral as it chooses.

### B. Bancomext Is Not Guilty of Laches

81. As an initial matter, "laches is a fact-intensive defense poorly suited to a motion to dismiss." *Kemp v. Eiland*, 139 F. Supp. 3d 329, 349-50 (D.D.C. 2015). *See also Vox Amplification Ltd v. Meussdorffer*, 50 F. Supp. 3d 355, 364 (E.D.N.Y. 2014) ("[C]ourts have declined to rule on the question of laches at the motion to dismiss stage because laches would necessarily involve a fact-intensive analysis and balancing of equities that would require the Court to consider matters outside of the pleadings that are in dispute.") (internal quotations omitted); *Flentye v. Kathrein*, 485 F. Supp. 2d 903, 916-17 (N.D. Ill. 2007) ("Since the defense of laches generally requires a fact-intensive inquiry it is usually not amenable to being resolved on summary judgment, let alone on a motion to dismiss.") (internal quotations, citations, and modifications omitted). The FAC is replete with allegations that Defendants behaved inequitably and actively sought to conceal from Bancomext their wrongful conduct. There is nothing on the face of the FAC or in the record of these proceedings to support the conclusion that Bancomext unreasonably or inexcusably delayed prosecution of its claim. Laches cannot operate at this stage of the proceedings.

82. In any event, the Committee cannot show—and certainly not by mere reference to the face of the FAC—that Bancomext is guilty of laches. Defendants decided to use the chapter

11 process not to pursue a plan but to pursue a quick agreement for the sale of their assets. (The

sale of the assets which are the subject of Bancomext's constructive trust claim will not actually

be quick—it's not scheduled to close until August 2018).

83.     As the Committee notes, Bancomext first became aware of the possibility it had

been defrauded by Defendants in mid-October 2017. Naturally, Defendants were not

forthcoming about their fraud and resisted Bancomext's efforts to investigate. On October 30,

2017, Bancomext entered a standstill agreement with the Mexican Entities that gave Bancomext

specific rights to obtain information about the disposition of its loan proceeds for the purpose of

investigating the fraud.[15] The Mexican Entities formally refused to provide information pursuant

to that agreement shortly after January 12, 2018. As a result, Bancomext was forced to file a

2004 motion which the Mexican Entities vigorously opposed, resulting in a delay in its

determination. Even after the Court granted the 2004 motion in substantial part on March 6,

2018, the Mexican Entities failed to comply, explaining that they needed consent from

Defendants and the Mexican Entities' shared corporate parent to produce documents located in

Italy, which consent was not forthcoming. *See* Bankr. D.I. 1397. This required further Court

intervention, and, as of the date hereof, the Mexican Entities have yet to fulfill their obligations

pursuant to the 2004 order.

84.     Notably, while the Committee faults Bancomext for not gaining a complete

understanding of Defendants' fraud in the five months between its inquiry notice and the sale

---

[15]   Defendants have asserted that the information Bancomext needs to fully develop its claims is largely in the
hands of the Mexican Entities. [Bankr. D.I. 1247, ¶ 78 n.40] ("[M]uch of the information upon which Bancomext
relies is in the Mexican Entities, and not the [Defendants'] control . . . ."). The Mexican Entities have represented to
the Court that the information that their information actually is in Defendants' control, and this is the reason the
Mexican Entities have failed to comply with the Court's 2004 order. [Bankr. D.I. 1397 at 2] ("M&G Mexico has
not produced the ESI in question because M&G Mexico *cannot* produce the ESI in question: it is not in M&G
Mexico's possession, custody, or control" (emphasis in original)). This is a game. The Mexican Entities are wholly
owned subsidiaries of Defendants and Defendants therefore ultimately control what information the Mexican
Entities can give to Bancomext.

hearing, even Defendants' professionals were still grappling with the facts for much of that time. In his first day declaration, Mr. Stogsdill testified there were no intercompany loans by M&G Polimeros to Defendants. [Bankr. D.I. 3 at Ex. B]. Ten days later, Defendants changed his testimony to reflect a $354 million loan from M&G Polimeros to a Defendant on September 19, 2017. [Bankr. D.I. 143 at Ex. 1]. At the February 22, 2018 hearing on Bancomext's 2004 motion, counsel for the Mexican Entities and Defendants each represented that no such loan was made. Feb. 22, 2018 Hr'g Tr. 46:17-47:4. Bancomext cannot be faulted for failing to extract from the unwilling Defendants and Mexican Entities information about material disputed issues that their own professionals seemed unable to comprehend.

85. Finally, the claim that Bancomext hid its intention to pursue its rights is simply false. In its 2004 motion, it made clear why it needed to investigate the Mexican Entities' uses of Bancomext's loan proceeds: "to ensure that the distribution of [the sale] proceeds [would not be] delayed by an extended investigation into Bancomext's rights with respect to such [sale] proceeds." [Bankr. D.I. 770, 3]. Its arguments at the hearing on the 2004 motion were much the same. In short, Bancomext has been completely transparent about its intentions in these proceedings and it timely filed its objection to the sale of the Corpus Christi assets, as supported by its initial complaint, on the schedule set by Defendants. Defendants, the Committee, and the lenders made the deliberate decision to exclude Bancomext from their negotiations, presumably because they did not think much of Bancomext's claims. They did so at their own peril. Bancomext has diligently pursued its rights within the confines set by the other parties to these proceedings.[16] Laches cannot bar it from continuing its efforts.

---

[16] Notably, the schedule for the sale approval was needlessly fast. Defendants fixed the deadline to object to the Corpus Christi sale just four months into their cases. The sale was not slated to close for another five months after that. In the absence of another good explanation for the haste, it is reasonable to conclude that Defendants wanted to force the sale through on a schedule that would prevent Bancomext from adequately investigating its interests. This

86.     Finally, in its attempt to paint Bancomext's approach as "dilatory," the Committee argues it was incumbent upon Bancomext to "obtain finality with respect to its constructive trust theory before [the sale hearing] to preserve its claim." Committee Joinder, 19. This is simply wrong. Section 363 of the Bankruptcy Code cannot be clearer. A sale may be authorized over a disputed interest. 11 U.S.C. § 363(f)(4). "[T]he purpose behind § 363(f)(4) 'is to allow the sale of property of the estate free and clear of disputed interests so the liquidation of the assets is not unnecessarily delayed *while the disputes are being litigated*.'" *In re NJ Affordable Homes Corp.*, 2006 Bankr. LEXIS 4498, at *40 (Bankr. D.N.J. June 29, 2006) (quoting *In re Robotic Vision Sys., Inc.*, 322 B.R. 502, 506 (Bankr. D.N.H. 2005)) (emphasis added). A sale pursuant to section 363(f)(4) is subject to the adequate protection requirements of section 363(e). *See* 11 U.S.C. § 363(e); *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 n.2 (Bankr. E.D. Pa. 1989) (noting that "any sale of debtor's assets under § 363(b) must comply with § 363(e) and (f)"). Such adequate protection is typically in the form of a transfer of the disputed interest to the sale proceeds. S. Rep. No. 989, 95th Cong., 2d Sess. 56 (1978), *reprinted in* 1978 U.S. Code Cong. & Admin. News 5787, 5842 (committee report on 11 U.S.C. § 363(f)) ("Most often, adequate protection in connection with a sale free and clear of other interests will be to have those interests attach to the proceeds of the sale."); *DB Structured Prods. v. Am. Home Mortg. Holdings (In re Am. Home Mortg. Holdings)*, 402 B.R. 87, 102 (Bankr. D. Del. 2009) ("[The proposed] free and clear sale would trigger [interest holder's] right under section 363(e) to adequate protection of its damages claim, which could require that the claim attach to the sale proceeds."); *In re DVI, Inc.*, 306 B.R. 496, 504 (Bankr. D. Del. 2004) ("Courts have permitted the sale of property free and clear of constructive trust claims or equitable liens, so long as they

conclusion is supported by the refusal of the Mexican Entities, under Defendants' control, to provide documents in accordance with their contractual obligations and even orders of this Court.

attach to the proceeds of the sale."). Bancomext was under no obligation to prove its constructive trust claim at or prior to the sale hearing in order to preserve its interest in the proceeds of the property, including the GUC Pool.

87. In short, the lapse of just five months between inquiry notice and filing a complaint on account of a massive international fraud is not unreasonable. Even if it were, Defendants' resistance to Bancomext's efforts to investigate, including through their control of the Mexican Entities, would excuse it. Laches therefore has no application to Bancomext's claim. *Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 138 (3d Cir. 2005) (laches requires unreasonable or inexcusable delay).

## 2. A Constructive Trust Can Be Imposed Postpetition

88. The Committee urges dismissal on the grounds that "a constructive trust cannot be imposed postpetition" as a matter of both bankruptcy law and Texas law. While the Committee's discussion of the bankruptcy law issues may comport with the view in the Sixth Circuit, it is not followed in this District. Moreover, the Committee's recitation of Texas law is wrong and contradicted by its own authorities. Finally, the Committee's speculation concerning the potential avoidability of Bancomext's asserted constructive trust pursuant to 11 U.S.C. § 544(a) is not determinative of whether Bancomext stated a claim for relief in the first instance, and, in any event, § 544(a) does not pose an complete bar to Bancomext's claimed interest.

89. The Committee begins with the proposition that 11 U.S.C. § 541(d) will sweep into the debtor's estate all legal and equitable interests in property subject to any constructive trust claims **unless** a court order recognizing the constructive trust entered prepetition. Committee Joinder, 10. For this proposition, it cites two cases from the Sixth Circuit, a decision of a Ninth Circuit Bankruptcy Appellate Panel, and a Minnesota bankruptcy court decision. In an attempt to bootstrap this inapposite authority into the Third Circuit, the Committee cites *Singh*

*v. AG of the United States*, 677 F.3d 503, 516 n.16 (3d Cir. 2012)—an immigration appeal with some dicta that does not suggest, much less compel, the proposition the Committee cites it for.

90.     Specifically, the Committee quotes *Singh* for the proposition that "a debtor's estate includes even property that is alleged to be fraudulently obtained, 'so long as the property was not impressed with a constructive trust prior to the commencement of the bankruptcy proceeding.'"  Committee Joinder, 11 (quoting *Singh*, 677 F.3d at 516 n.16).  In the Committee's view, following the Sixth Circuit, property is not "impressed" with a constructive trust prior to the petition date unless it was adjudicated prior to the petition date.  Notably, the *Singh* dicta is to the contrary.  There, the Third Circuit speculated that the Port Authority—which had been defrauded by the alien-subject-to-deportation/former debtor prior to the alien's bankruptcy petition date—was the beneficiary of an extant constructive trust even though it is clear from the opinion that no adjudication of such status was ever made.  *See id.* ("Singh would have had no means for obtaining the $54,000 from the Port Authority (the defrauded party) for his personal benefit because a wrongdoer's interest in fraudulently obtained property is . . . subject to a constructive trust . . . .").

91.     More importantly, the law followed in this District is contrary to the Committee's view.  In *DVI*, this Court found that property subject to an asserted, but not determined, constructive trust interest would be excluded from a debtor's estate under section 541(a) if the interest was determined after the petition date to have arisen, under state law, prior to the petition date.  306 B.R. at 499-501.  Likewise, in *Claybrook v. Consolidated Foods, Inc.* (*In re Bake-Line Group, LLC*), 359 B.R. 566, 571-75 (Bankr. D. Del. 2007), the Court found that, even though a constructive trust interest in property had not been determined prior to the petition date, it arose prior to the petition date under applicable state law such that conveyance of the res by the debtor to the constructive trust beneficiary did not constitute an avoidable preference.  In short, the lack

of a prepetition order impressing a constructive trust does not, in this District, prevent a putative

trust beneficiary of establishing rights in a debtor's property postpetition so long as the interest is

deemed, under applicable state law, to have arisen prepetition. Under Bancomext's allegations,

its putative trust interest arose prepetition under Texas law.

92. The Committee cites to *York v. Boatman*, 487 S.W.3d 635, 647 (Tex. App. 2016)

for the proposition that, under Texas law, "a constructive trust does not exist 'unless and until a

court imposes it as a remedy.'" Committee Joinder 12. The Committee improperly conflates the

date of recognition of a trust with the date on which a trust is deemed to arise. Under Texas law,

a constructive trust is deemed to arise at the time of the wrongful transfer or other conduct giving

rise to the trust. As stated by the Texas Supreme Court in *Meadows v. Bierschwale*, 516 S.W.2d

125, 133 (Tex. 1974), a constructive trust over property transferred by fraudulent inducement

"arises when legal title passes."[17] The relation-back principle in Texas constructive trust cases

has been recognized repeatedly. *See, e.g.*, *Blankenship v. Citizens Nat'l Bank*, 449 S.W.2d 77,

79 (Tex. Ct. App. 1969) (misrepresentation concerning value of share pledged to secure

obligation gave rise to "constructive trust [that] ***arose at the time the separate collateral***

***agreement was entered into*** vesting the bank with equitable title to the stock" representing the

intended share); *Marathon Mach. Tools, Inc. v. Davis-Lynch, Inc.*, 400 S.W.3d 133, 137 (Tex.

App. 2013) (finding that constructive trust established by later court order had arisen as of the

date payments were made by constructive trustee using funds stolen from constructive

beneficiary, resulting in priority over intervening security interest in acquired property); *In re*

*Lodek*, 61 B.R. 66, 68 (Bankr. W.D. Tex. 1986) (Texas law) ("[The holder of an equitable lien

arising out of a constructive trust] has, prior to any judicial action, an interest in a specific piece

---

[17] The Committee cites *Meadows* elsewhere in its Joinder but chose to ignore it for this point.

of property. . . . The constructive trust arises when legal title to the property wrongfully taken passes.").  Texas's relation back rule is in-line with what this Court has recognized as "the opinions of the majority of the states, which agree that constructive trusts attach or relate back to the time of the unlawful act that led to the creation of the trust."  *Bake-Line Grp.*, 359 B.R. at 574 (internal quotations omitted).  It is also consonant with the rule of the Restatement of Restitution.  *Id.* (citing Restatement of Restitution § 160 (1937)).

93.     The Committee's citation, *York v. Boatman*, was concerned not with when a trust arose but when the time to assert the claim expired.  In challenging the trial court's conclusion that her claim was time-barred, the plaintiff contended that her constructive trust claim arose not at the time the property transferred but when the putative trustee repudiated the purported trust.  487 S.W.3d at 646.  Put simply, the plaintiff argued that rights of enforcement of a constructive trust followed the same rules as those of an express trust.  The court rejected the plaintiff's repudiation accrual theory because "[n]o constructive trust exists unless and until a court imposes it as a remedy."  *Id.* at 647.  Instead of waiting for repudiation by an unwitting constructive trustee, a cause of action on a constructive trust accrues at the time of the conduct giving rise to the trust.  *See Carr v. Weiss*, 984 S.W.2d 753, 761 (Tex. App. 1999) (limitations period begins to run against the enforcement of a constructive trust "at the inception of the trust," subject to tolling).  This is consistent with the rule in Texas and the majority of other states that a constructive trust arises at the time of the wrong.

94.     Finally, the Committee notes that section 544(a) gives the trustee the power to avoid certain interests in property as a hypothetical judicial lien creditor or bona fide purchaser for value and that "bona fide purchasers and perfected lienholders have priority over a constructive trust."  Committee Joinder, 11.  If the Debtors wish to avoid Bancomext's interest in their property, they will need to take affirmative action to do so.  *Canney v. Merchants Bank (In*

44

*re Frazer*), 284 F.3d 362, 374 (2d Cir. 2002) ("to exercise 'strong arm' powers under § 544, a

trustee must file an adversary proceeding"); *Barkley v. W.* (*In re W.*), 474 B.R. 191, 205 (Bankr.

N.D. Miss. 2012) (finding that "Congress did not intend for § 544(a) to be self-effectuating");

*Noland v. HSBC Auto Fin., Inc.* (*In re Baine*), 393 B.R. 561, 566 (Bankr. S.D. Ohio 2008)

("Obviously, lien avoidance is not self-effectuating.").

95.     Even if the Committee, which does not wield the strong-arm power, is correct that

a Texas bona fide purchaser for value would take real property free of a constructive trust claim,

section 544(a)(3) applies only to real property not constituting fixtures.  11 U.S.C. § 544(a)(3)

(affording trustee the rights of "a bona fide purchaser of real property, ***other than fixtures***"); *In

re Hydro-Action, Inc.*, No. 01-10209, 2004 Bankr. LEXIS 262, at *27 n.16 (Bankr. E.D. Tex.

Jan. 22, 2004) (noting that, to the extent that debtor's conveyor belt system constituted a fixture,

§ 544(a)(3) could not be used to avoid interest asserted therein); *In re Madison's Partner Grp.,

Inc.*, 67 B.R. 629, 631 (Bankr. D. Minn. 1986) (trustee could not avoid interest asserted in

restaurant debtor's 29-foot bar as a result of § 544(a)(3)'s fixture exception).  Thus,

section 544(a)(3) would not serve to cut off Bancomext's rights in fixtures, which, at a

manufacturing plant like the Corpus Christi plant, are necessarily of substantial value.

96.     With respect to section 544(a)(1), Bancomext's constructive trust, once

established, would take precedence over the trustee's hypothetical judicial lien arising on the

Petition Date.  This is because, as already explained above, such a lien would relate back to the

date of the wrong.  While the Committee cites *MBank Waco, N.A. v. L.&J., Inc.*, 754 S.W.2d

245, 251 (Tex. App. 1988) for the proposition that a constructive trust beneficiary is junior to a

later-perfected secured claim, *MBank's* analysis on this point has been noted as "largely in

dicta."  *Marathon Mach. Tools, Inc. v. Davis-Lynch, Inc.*, 400 S.W.3d 133, 137 n.10 (Tex. App.

2013).  The contrary conclusion was central to the decision in *Marathon Machine Tools*.  There,

non-party Hanna-Skye bought equipment in June 2009 on credit from Marathon Machine Tools, making initial payments with money Hanna-Skye had stolen from Davis-Lynch. The appellate court assumed that Marathon perfected its security interest in the equipment in February 2010. Davis-Lynch, which had sued Hannah-Skye in January 2010, filed a motion to enforce a constructive trust over the stolen funds in May of 2010, which was granted. Pursuant to that order, Davis-Lynch took possession of the subject equipment. Marathon sued Davis-Lynch to vindicate its February 2010 security interest, which it claimed was superior to Davis-Lynch's constructive trust interest. The Texas appellate court concluded that Davis-Lynch's constructive trust interest was superior to Marathon's February 2010 consensual lien because it related back to the time of the wrong:

> A constructive trust arose in favor of Davis-Lynch in June 2009 after Hanna-Skye made partial payments for the [equipment] using Davis-Lynch's stolen funds and when Marathon transferred the [equipment] to Hanna-Skye. *See Meadows v. Bierschwale*, 516 S.W.2d 125, 133 (Tex. 1974) . . . . A person claiming equitable ownership under a constructive trust is a lien creditor with respect to the property covered by the trust. *Meadows*, 516 S.W.2d at 133. Accordingly, Davis-Lynch became a lien creditor with rights to the [equipment] seven months before Marathon perfected its security interest in February 2010.

*Marathon Mach. Tools*, 400 S.W.3d at 137.

97. Just as the relation back of the equitable lien in *DVI* defeated the trustee's section 544(a)(1) powers under Illinois's first-in-time priority rules, 306 B.R. at 503, the relation back of Bancomext's constructive trust to the wrongful conduct occurring prior to the petition date would defeat the trustee here under Texas's first-in-time priority rules. *See In re Casbeer*, 793 F.2d 1436, 1443 (5th Cir. 1986) (Texas follows first-in-time priority rule subject to relation back exceptions).

98. In sum, the Committee fails to show that Bancomext is barred as a matter of law from asserting a constructive trust after the Petition Date.

### 3. Bancomext Adequately Pleads a Claim for Constructive Trust

99.     In order to establish a constructive trust over the Corpus Christi Assets (located in Texas), Bancomext will ultimately have to show the following: *First*, that a trust relationship and its legal source exist; and *second*, that it can identify and trace trust funds if commingled. *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95 (3d Cir. 1994).

100.    The first element is determined by reference to state substantive law. Under Texas law, the elements of a constructive trust are: "(1) . . . actual or constructive fraud; (2) unjust enrichment of the wrongdoer; and (3) an identifiable *res* that can be traced back to the original property." *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 87 (Tex. 2015). The second is determined under federal law. *Goldberg v. N.J. Lawyers' Fund for Client Prot.*, 932 F.2d 273, 280 (3d Cir. 1991) (citing *Connecticut Gen. Life Ins. Co. v. Universal Ins. Co.*, 838 F.2d 612, 618-19 (1st Cir. 1988)). Bancomext satisfies each of these elements to the extent required at the pleading stage.

### A. Bancomext Sufficiently Alleges the Actual or Constructive Fraud Element

101.    The other counts in the FAC are as follow: fraud (Count 1); fraudulent misrepresentation (Count 2); aiding and abetting fraud (Count 3); civil conspiracy (Count 4); actual fraudulent transfer (Count 5); conversion (Count 6); constructive fraudulent transfer (Count 7). Each count in the FAC suffices as a predicate count for imposition of a constructive trust because each alleges fraudulent, constructively fraudulent, or otherwise sufficiently wrongful conduct. *See KCM Fin. LLC v. Bradshaw*, 457 S.W.3d at 87 (first element satisfied by, *inter alia*, actual or constructive fraud); *Nwokedi v. Unlimited Restoration Specialists, Inc.*, 428 S.W.3d 191, 211 (Tex. App. 2014) (imposing constructive trust on fraudulently transferred funds); *Freeman v. Harleton Oil & Gas, Inc.*, 528 S.W.3d 708, 733 (Tex. App. 2017) (noting

conversion as a proper predicate for a constructive trust).  Notably, it is not necessary for imposition of a constructive trust that the particular defendant holding the property participated in the fraud.  A constructive trust may be properly imposed on the property of "a knowing or unknowing beneficiary of fraud, even though he is not the actual wrongdoer." *Ginther v. Taub*, 675 S.W.2d 724, 728 (Tex. 1984).

102.    For the reasons stated herein that Plaintiff sufficiently pleads its other claims in the FAC, it sufficiently pleads the first element of constructive trust.

### B.  Bancomext Sufficiently Alleges the Unjust Enrichment Element

103.    Unjust enrichment occurs when the "person sought to be charged [has] wrongfully secured a benefit or [has] passively received one which it would [be] unconscionable to retain." *City of Corpus v. S.S. Smith & Sons Masonry, Inc.*, 736 S.W.2d 247, 250 (Tex. App. 1987).  Plaintiff alleges in the FAC that Defendants wrongfully caused the Mexican Entities to procure the Bancomext loans and deliver to Defendants control of the ill-gotten proceeds.  *See, e.g.*, FAC ¶¶ 41-45, 52-62, 83-94 & 136.  Allowing Defendants to retain these ill-gotten funds would be unconscionable.

104.    Defendants do not argue that Plaintiff failed to adequately plead the elements of unjust enrichment.  Instead, they claim that the express contract defense to unjust enrichment appears on the face of the FAC.  *See* Dfts. Br., 15-17.  The express contract defense provides that the existence of an express contract covering the same subject matter as an unjust enrichment claim is a complete defense to that claim.  Citing a case with no analysis of the matter, *Baxter v. PNC Bank N.A.*, 541 F. App'x 395, 397 (5th Cir. 2013), Defendants assert that this defense applies to the unjust enrichment element of constructive trust under Texas law.

105.     The express contract defense makes sense as far as it goes.  A counterparty disappointed by its bargained-for contract rights must not be allowed to rewrite the agreement through an equitable claim.  Here, however, Bancomext is not pursuing a contract or quasi-contractual claim.  Rather, it is seeking redress of the fraud and other torts committed against it by Defendants in concert with and through the Mexican Entities.  As such, the express contract defense does not apply.

106.     Generally, "[a] party may recover under the unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage."  *Heldenfels Bros., Inc. v. Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992).  That a contract was entered by the parties does not change this where the contract itself was fraudulently induced.  *See McAfee, Inc. v. Agilysys, Inc.*, 316 S.W.3d 820, 828 (Tex. App. 2010) (noting "evidence of fraud, bad faith, or illegality" as exceptions to the express contract defense) (citing *Res. Title Agency, Inc. v. Morreale Real Estate Servs., Inc.*, 314 F. Supp. 2d 763, 772 (N.D. Ohio 2004)).  This exception is widely recognized in other jurisdictions as well.  *See, e.g.*, *Advanced Thermal Scis. Corp. v. Applied Mats. Inc.*, 2009 U.S. Dist. LEXIS 139444, at *21 (C.D. Cal. Oct. 2, 2009) ("[I]f [a] contract was procured by fraud, is unenforceable, or is otherwise ineffective, then an unjust enrichment claim may lie."); *LVI Grp. Invs., LLC v. NCM Grp. Holdings, LLC*, 2018 Del. Ch. LEXIS 101, *43-46 (Del. Ch. Mar. 28, 2018) (finding express contract defense inapplicable to claim plaintiff alleged defendants had fraudulently induced).

107.     The fraud exception is illustrated in the constructive trust context in one of the cases that Defendants rely on elsewhere in their brief, but ignore where it defeats their express contract defense.  In *Meadows*, 516 S.W.2d 125, the Texas Supreme Court upheld imposition of a constructive trust over proceeds of a building the defendant had fraudulently induced the

plaintiff to sell the defendant, pursuant to a contract for sale, in exchange for worthless notes. The defendant, in turn, sold the property to a third party for value. As the court explained:

> Bearing in mind that [defendant] procured the apartment complex from [plaintiff] by fraud, [plaintiff] would have, but not for the sale to [third party], ***been entitled to the imposition of a constructive trust on the apartment complex***. It follows that [plaintiff] is entitled to a constructive trust on the ***proceeds*** of the sale of the apartment complex to [third party] . . . .

*Id*. at 129 (emphasis added).

108.    Plaintiff's allegations that it was fraudulently induced to enter the Credit Agreements defeat Defendants' express contract defense. Plaintiff adequately pleads the unjust enrichment element of constructive trust.

### C. Bancomext Satisfies Its Tracing Obligation at the Pleading Stage by Identifying the Corpus Christi Assets as a Res

109.    Tracing under federal common law need not be established at the pleading stage. *See Redrock Admin. Servs. LLC v. Magna Entm't Corp.* (*In re Magna Entm't Corp.*), 438 B.R. 380, 395 (Bankr. D. Del. 2010) (agreeing with plaintiff that range of tracing options and fact-intensive nature of analysis made tracing determination inappropriate on motion to dismiss prior to discovery). *Stanton v. Couturier*, 2007 U.S. Dist. LEXIS 95515, at *11-12 (E.D. Cal. Dec. 21, 2007) (addressing equitable tracing in context of federal ERISA claim) ("The Court agrees that in order to impose a constructive trust, the particular funds or property upon which a constructive trust is to be imposed must be identified and traceable back to the ill-gotten profits . . . . However, [Defendant] cites no authority for the proposition that the funds or property must be identified in the complaint, and independent research by the Court has not revealed any such controlling authority.").

110.    The reason for this is clear. To require plaintiffs to plead tracing "would require a person seeking to impose a constructive trust to engage in a significant degree of pre-filing investigation and obtain information peculiarly in the possession of the defendant that is

normally part of the discovery process in civil actions." *Id.* at *12. Whether a plaintiff can ultimately show tracing "cannot be determined at [the pleading] stage of the proceedings; it can only be determined after . . . an opportunity to conduct discovery and fully develop the facts." *Id.*; *accord Teachers' Ret. Sys. v. Aidinoff*, 900 A.2d 654, 672 (Del. Ch. 2006) (applying Delaware's federal-equivalent Rule 12(b)(6) standard) ("At this early stage, it would be inappropriate to deny [plaintiff] the opportunity to make the appropriate showing that specific funds remain in [defendant's] hands that are attributable to excessive payments from AIG."); *In re Suniva, Inc.*, No. 17-10837 (KG), 2018 Bankr. LEXIS 761, at *8 (Bankr. D. Del. Mar. 16, 2018) (declining to overrule objection to cash collateral motion as matter of law absent discovery on tracing issue).

111. Here, Defendants highlight the problem with adjudicating Bancomext's constructive trust claim at this stage by introducing into the record, in defense of the claim, bank statements that have not been provided to Bancomext. Dfts. Br., 7 & n.6. A defendant cannot prevent a plaintiff from obtaining discovery by selectively presenting factual matter tending to defeat the claim. *See Clemmons v. NVT Techs., Inc.*, 2015 U.S. Dist. LEXIS 86983, at *10-11 (M.D.N.C. July 6, 2015) (quoting *Robinson v. Quicken Loans Inc.*, 2012 U.S. Dist. LEXIS 120367 (S.D.W. Va. Aug. 24, 2012)) ("In this case, it cannot be fairly said that the documents [defendant attaches to its motion to dismiss] are in any way 'integral to and explicitly relied on in the complaint.' Moreover, '[t]hat the Complaint raises this general issue does not . . . permit the Defendant to selectively attach one of what may be many documents relevant to the issue, while avoiding the fuller picture provided by the discovery process.'").[18]

---

[18] For the same reason, Bancomext submits that, notwithstanding Defendants' argument in footnote 6 of their brief, the bank statements Defendants attach to their brief are not properly considered in connection with the MTD. Subject to limited exceptions, motions to dismiss must be decided on the allegations contained in the complaint. *PBGC v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Defendants' selectively presented bank

112.     Importantly, merely alleging that funds have been commingled does not preclude tracing under federal law required for imposition of a constructive trust in bankruptcy. *See EBS Pension L.L.C. v. Edison Bros. Stores, Inc.* (*In re Edison Bros., Inc.*), 243 B.R. 231, 240 (Bankr. D. Del. 2000) (rejecting motion for summary judgment "premised on the broad assertion that the commingling of funds pre-petition mandates a finding in [debtor's] favor, an argument expressly rejected by the Third Circuit in *Sharon Steel*"). As the Third Circuit explained in *Sharon Steel Corp.*, a bankruptcy court applying tracing rules "certainly should keep in mind the broader policy against allowing a party unilaterally to make a trust unenforceable by commingling assets." 41 F.3d at 102 n.10.

113.     At the pleading stage in a bankruptcy proceeding, a person asserting a constructive trust satisfies its tracing obligation merely by identifying a res. *See Over & Out, Inc. v. Eclipse Aviation Corp.* (*In re AE Liquidation, Inc.*), 426 B.R. 511, 519 (Bankr. D. Del. 2010) (denying motion to dismiss where plaintiff identified a res—deposits that it had paid to the debtor); *see also In re U.S.N. Co.*, 32 B.R. 675, 678 (Bankr. S.D.N.Y. 1983) ("[P]laintiffs' failure to identify a *res* in their pleading does not, in itself, justify a dismissal of the constructive trust claim . . . .").

114.     For the purposes of Bancomext's constructive trust claim, the Corpus Christi plant constitutes the res. Bancomext sufficiently alleges in the FAC that the proceeds of its loans to the Mexican Entities were wrongfully obtained specifically to pay for construction of the Corpus Christi assets and were, in fact, used for such wrongful purpose. Relevant allegations include the following:

---

statements, which Plaintiff had never seen before, are neither explicitly relied upon nor integral to the allegations of the FAC. *See* Dfts. Br. 7 & n.6.

- Dennis Stogsdill, while an officer of both Defendants and the Mexican Entities, told Bancomext's representatives that "the proceeds of Bancext's loans and its collateral . . . had been sent to the United States [and] there was no way to get it back . . . ." FAC ¶ 73.

- Mr. Stogsdill attested that the Mexican Entities were indebted to Defendant M&G USA on intercompany loans in the amount of $547,162,000. FAC ¶ 72.

- M&G USA is the owner of M&G Resins, which, in turn, is the owner of the Corpus Christi plan. FAC ¶ 54.

- Specific draws under the M&G Polimeros Credit Facility corresponded to simultaneous or substantially contemporaneous transfers into and then out of the Pooling Account to M&G Resins, M&G USA, and M&G International, each a direct or indirect owner of the Corpus Christi plant. FAC ¶ 54 & Ex. E.

- Defendants fraudulently caused M&G Polimeros to obtain the M&G Polimeros Credit Facility for the specific purpose of funding budget shortfalls in the construction of the Corpus Christi plant. FAC ¶¶ 36-45.[19]

- On these bases, "Bancomext believes and alleges that a substantial portion of . . . the proceeds of the Credit Facilities were . . . used to build the Corpus Christi plant . . . ." FAC ¶ 75.

Certainly these allegations satisfy *Twombly's* plausibility requirement of alleging "enough fact to raise a reasonable expectation that discovery will reveal evidence" sufficient to prove the constructive trust claim. *Twombly*, 550 U.S. at 556.

115. To the extent that Bancomext does bear any burden to ultimately trace under Texas law, the same allegations above satisfy Texas's prima facie tracing allegations. Under Texas law, upon the allegation that wrongfully obtained funds have been commingled in a pool subsequently used to acquire property, "the constructive trustee must prove what part of the

---

[19] "[T]he costs of construction far exceeded Defendants' budgeted costs . . . . [U]nable to obtain further credit on commercial terms, Defendants were forced to get more creative . . . . When DAK's cash proved inadequate to complete the plant, Defendants turned to the cash flow and credit of the Mexican Entities. . . . While Defendants were heading for financial ruin and mortgaging their future to fund the Corpus Christi plant, the Mexican Entities were profitable and had significant EBITDA. . . . Unable to get sufficient credit on their own, Defendants caused M&G Polimeros to approach Bancomext with a request for another $70 million. . . . Defendants caused M&G Polimeros to agree to [use restrictions] even though they never intended that M&G Polimeros would comply with such terms. Indeed, Defendants intended to use the proceeds of the M&G Polimeros Credit Facility to provide capital for Defendants and not for use by M&G Polimeros."

funds used to purchase the properties was his money only, otherwise, the whole fund may be subjected to a constructive trust." *Flournoy v. Wilz*, 201 S.W.3d 833, 836-37 (Tex. Ct. App. 2006); *see also Md. Cas. Co. v. Schroeder*, 446 S.W.2d 117, 121 (Tex. Civ. App. 1969) ("[W]e hold that because of the commingling of the embezzled funds with funds and property of the [constructive trustee], that all of such property became the subject of a constructive trust, and plaintiff having proved specific property of defendants [acquired with the commingled funds], the burden then shifted to the wrong-doer . . . to separate, if he could, and show that his money, and not the embezzled money, paid for the properties, in whole or in part.").

116.    Plaintiff has adequately pleaded its claim for constructive trust.

## CONCLUSION

For all of the foregoing reasons, Bancomext requests that the Court (i) deny Defendants' MTD; and (ii) grant such other and further relief as the Court deems just and proper.

Dated:  May 25, 2018                    **FOX ROTHSCHILD LLP**

By: /s/ *Margaret M. Manning*
    Jeffrey M. Schlerf (DE No. 3047)
    Margaret M. Manning (DE No. 4183)
    919 North Market Street, Suite 300
    Wilmington, DE 19801
    Telephone:    (302) 654-7444
    Facsimile:     (302) 656-8920
    jschlerf@foxrothschild.com

          —and—

    Roberto J. Kampfner (admitted pro hac vice)
    Aaron Colodny (admitted pro hac vice)
    **WHITE & CASE LLP**
    555 South Flower Street, Suite 2700
    Los Angeles, CA 90071
    Telephone:    (213) 620-7700
    Facsimile:     (213) 452-2329
    rkampfner@whitecase.com

    *Attorneys for Banco Nacional de Comercio*
    *Exterior, S.N.C., Institución de Banca de*
    *Desarrollo*